2005 UT App 274

**OGDEN CITY CORPORATION,**
Petitioner,

v.

**Daniel HARMON and Ogden Civil
Service Commission,**
Respondents.

No. 20031030–CA.

Court of Appeals of Utah.

June 16, 2005.

Camille N. Johnson, Stanley J. Preston, and Judith D. Wolferts, Snow, Christensen & Martineau, Salt Lake City, for Petitioner.

D. Bruce Oliver, Salt Lake City, and Douglas Holmes, Ogden, for Respondents.

Before Judges JACKSON, ORME, and THORNE.

## OPINION

JACKSON, Judge:

¶ 1 Ogden City (the City) appeals the Ogden Civil Service Commission's (the Commission) order reversing the City's decision to terminate Daniel Harmon's employment. We reverse and remand the Commission's order.

## BACKGROUND

¶ 2 This case involves the conduct of Daniel Harmon, a captain in the Ogden City Fire Department (the Fire Department). On September 8, 2000, the Fire Department received a complaint regarding an alleged incident of sexual harassment occurring two years prior, involving Harmon and a subordinate female employee. In response, the Fire Department conducted an investigation in which it discovered several incidents of misconduct involving Harmon. The Fire Department held hearings on December 11, 2000, and afterwards, on December 15, 2000, Chief Mike L. Mathieu issued a letter notifying Harmon that his employment with the Fire Department would be terminated the next day due to violations of city and department regulations. Harmon appealed his dismissal to the Commission pursuant to Utah Code section 10–3–1012. *See* Utah Code Ann. § 10–3–1012(2) (2003).[1]

---

1. For convenience we refer to the 2003 version of the statute which is, for all practical purposes, identical to that in effect in 2000.

¶ 3 The Commission held hearings and, in its November 20, 2003 Finding of Fact, Conclusions of Law and Order, the commissioners agreed that several of the incidents tended to support the Fire Department's decision to discipline. First, the Commission found that during the fall of 1996, Harmon had, as an official of the Firefighter's Union, coordinated a fund-raising event for the Muscular Dystrophy Association (MDA) in which he permitted female entertainers to pose topless with firefighters. Second, the Commission found that Harmon had missed three mandatory training meetings between 1999 and 2000. Third, the Commission found that during the summer of 1999 Harmon, who also operated a lawn fertilizing business, agreed to provide a retired battalion chief and former supervisor with a bottle of Round–Up weed-killer for the chief's personal use. Harmon and two other firefighters filled an empty bottle with their urine, which the chief later picked up understanding it to be the promised weed-killer. Finally, the Commission also found that during a summer 2000 training exercise Harmon urinated into a drafting pit, or water reservoir, being used by his and another fire crew. Although the Commission concluded that the incident would not have supported a criminal charge for public urination, it did support the present employment charges against him.

¶ 4 Two of the three commissioners agreed that the remaining incidents did not support the charges against Harmon and should not be considered in determining whether his employment should be terminated. The Commission found that approximately eight to ten years before the investigation, Harmon had urinated into a shower stall occupied by another firefighter. The majority concluded that this should not be considered because it was understood by the other firefighters as a joke and never resulted in complaints by those present. Moreover, the evidence did not indicate precisely when the event occurred or whether Harmon had yet been made a captain.

¶ 5 Further, the Commission found that in November 1998 Harmon engaged in a sexual dialogue with a female firefighter who was a probationary employee. The female firefighter had apparently held up a cucumber or zucchini and stated to Harmon, "Do you know what they call these where I'm from? Home-wreckers." When, as a captain, Harmon should have corrected the employee and warned her about making improper comments, he instead furthered the exchange by later presenting the female firefighter with a greased cucumber or zucchini while she was on the telephone with her husband and asking, "Is this big enough?" The majority determined that this event did not support the charges against Harmon because the female firefighter laughed and because "it was a consensual exchange, was isolated, and was not offensive to either party, [and] it could not be considered sexual harassment or considered to otherwise violate Department policy."

¶ 6 Finally, the Commission found that throughout his tenure as captain, Harmon had tolerated a specific form of sexually-oriented horseplay among the male firefighters in his station, in which they would, while clothed, imitate sexual intercourse with each other. The majority determined that Harmon's failure to stop the bizarre practice of grown men "humping" each other did not support the charges against him because the "activity was common in the Department, did not involve females, was consensual, and had continued for many years without any[one] ever being told that it violated Department policy."

¶ 7 The majority of the commissioners reversed the Fire Department's decision to discharge Harmon. It concluded that only the MDA incident, the Round–Up incident, the drafting pit incident, and Harmon's absenteeism should be considered in its determination. Based on these charges, the majority determined that discharge was an excessive remedy because the events occurred over an extended period of time, Harmon was not given progressive punishment, and similar violations by others were not punished as severely. The third commissioner dissented, concluding that the shower incident, the "zucchini" incident, and the "humping" horseplay should all be considered to support the charges against Harmon; and even if they were not, dismissal would be an appropriate

sanction because Harmon's conduct indicated a pattern of unacceptable behavior.[2]

## ISSUES AND STANDARD OF REVIEW

¶ 8 On appeal, the City claims the Commission's reversal of the chief's decision to dismiss Harmon is in error because the majority of Commissioners failed to properly consider (a) the shower incident, (b) the "zucchini" incident, (c) the ongoing "humping" horseplay, and (d) Harmon's failure to properly answer questions during the December 11, 2000 Fire Department hearing. The City claims, moreover, that the Commission exceeded its authority and abused its discretion in reversing the Fire Department's decision to discharge Harmon.

¶ 9 Our review of the Commission's order is limited to "the record of the [C]ommission." Utah Code Ann. § 10–3–1012.5 (2003). We review the Commission's decision "for the purpose of determining if the [C]ommission has abused its discretion or exceeded its authority." *Id.* The statute itself does not further define when the Commission may have abused its discretion, but we take guidance from the general principle of administrative law that when " '[t]he Legislature has granted the Commission discretion to determine the facts and apply the law to the facts in all cases coming before it . . . we must uphold the Commission's determination . . . unless the determination exceeds the bounds of reasonableness and rationality.' " *McKesson Corp. v. Labor Comm'n,* 2002 UT App 10, ¶ 11, 41 P.3d 468 (third alteration in original) (citation omitted) (interpreting Labor Commission Act, Utah Code section 34A–1–301 (1997)); *see also Ae Clevite, Inc. v. Labor Comm'n,* 2000 UT App 35, ¶ 6, 996 P.2d 1072 (" 'When the Legislature has granted an agency discretion to determine an issue, we review the agency's action for reasonableness.' " (citation omitted)) (interpret-

ing Utah Administrative Procedures Act, Utah Code section 63–46b–16 (1997)).

## ANALYSIS

¶ 10 Pursuant to Utah Code section 10–3–1012, a discharged civil service employee may appeal the discharge to the Commission, "which shall fully hear and determine the matter." Utah Code Ann. § 10–3–1012(2). In doing so, the Commission is to make two inquiries: " '(1) do the facts support the charges made by the department head, and, if so, (2) do the charges warrant the sanction imposed?' " *Kelly v. Salt Lake City Civil Serv. Comm'n,* 2000 UT App 235, ¶ 16, 8 P.3d 1048 (quoting *In re Discharge of Jones,* 720 P.2d 1356, 1361 (Utah 1986)).

¶ 11 Under the first prong, the majority of the Commission determined that the shower incident, the "zucchini" incident, and the "humping" did not support the charges against Harmon. The City takes issue with this conclusion, arguing that these incidents should be included in the analysis because, as the Commission itself found, the incidents did in fact occur.

¶ 12 We agree with the City. The majority of the Commission disregarded the shower incident primarily because it occurred several years prior to the investigation. Although an incident's remoteness in time may be relevant in mitigating the degree of discipline imposed, it does not erase the fact that Harmon committed a violation of department rules which merited discipline. Similarly, the majority commissioners disregarded the "zucchini" incident on grounds that the female firefighter was a willing and active participant. Here too, the fact that no offense was expressed may mitigate the degree of discipline imposed, but the fact remains that such behavior was contrary to applicable policies and regulations and, as Harmon acknowledges, inappropriate for the workplace.[3] Finally, the majority concedes

---

2. Commissioner Lemke, who was in the majority, wrote a separate opinion bemoaning the Commission's inability to substitute a lesser form of discipline for the termination that had been ordered by Chief Mathieu, given his reading of our opinion in *Salt Lake City Corp. v. Salt Lake City Civil Service Commission,* 908 P.2d 871 (Utah Ct.App.1995).

3. The Commission found that "Harmon initially did not think the incident was a problem" but "later acknowledged that the type of joke with a sexual connotation was not appropriate in the work place."

that the ongoing sexual horseplay among the firefighters "might support the charge" against Harmon, but concluded that it was permissible given that such horseplay occurred frequently for several years without complaint. We cannot agree that a violation of department regulations is justifiable merely because it is common and consensual among the participants; such considerations are relevant only in that they may affect the degree of discipline imposed.

¶ 13 The City next argues that the Commission failed to consider evidence that Harmon had been untruthful or evasive in responding to questions in the December 11, 2000 Fire Department predetermination hearing. During the hearing, which was headed by Chief Mathieu, Harmon was asked regarding the incident in which he allegedly substituted urine for weed-killer. Harmon's attorney was not present, and he responded only by referencing a prior letter in which he had denied the accusation. Because several witnesses had confirmed that the incident had occurred, Mathieu concluded that Harmon was being untruthful. This was later confirmed when Harmon testified before the Commission that he had participated in the incident.

■ ¶ 14 We reach no conclusion in regard to whether this incident does or does not support the charges against Harmon, but we agree with the City that the Commission is under an obligation to address each of the grounds for termination stated by the department head. Chief Mathieu has twice referenced the incident, first in his memorandum summarizing Harmon's violations and later in his testimony before the Commission; however, the Commission does not address it in its findings of fact or conclusions of law. An allegation of dishonesty, if proven, would violate Fire Department regulations [4] and could possibly add further support to the charges against Harmon. As such, it must be considered.

¶ 15 Having determined that the shower incident, the "zucchini" incident, and the "humping" horseplay were relevant, support the charges against Harmon, and should have been considered by the Commission, we reverse the Commission's order and remand to allow it to determine whether these incidents, taken together with the other incidents, warrant the sanction of dismissal.[5] On remand the Commission should also determine whether Chief Mathieu's allegations of dishonesty additionally support the charges against Harmon and, if so, whether they further justify the Fire Department's decision to dismiss him.

■ ¶ 16 In determining whether the sanction of dismissal is warranted in this case, the Commission must affirm the sanction if it is (1) appropriate to the offense and (2) consistent with previous sanctions imposed by the department. *See Kelly v. Salt Lake City Civil Serv. Comm'n,* 2000 UT App 235, ¶ 21, 8 P.3d 1048. The Commission has already determined that Harmon offered no evidence of inconsistency, and therefore, the question of severity is of primary importance in this case.

■ ¶ 17 In weighing the punishment against the offense, the Commission must give deference to the chief's choice of punishment because, as the head of the Fire Department, he is in a position to balance the competing concerns in pursuing a particular disciplinary action. *See id.* at ¶ 22 (" '[D]iscipline imposed for employee misconduct is within the sound discretion of the [c]hief.' " (quoting *Lucas v. Murray City Civil Serv. Comm'n,* 949 P.2d 746, 761 (Utah Ct.App. 1997))); *cf. In re Discharge of Jones,* 720 P.2d 1356, 1363 (Utah 1986) ("The sheriff must manage and direct his deputies, and is in the best position to know whether their actions merit discipline."). Likewise, the Commission must give deference to the chief's determination of whether progressive

4. Fire Department regulations prohibit "the making of misleading ... statements with the intent to deceive." Ogden City Fire Department Regulations, R–0497, ch. 3, § 32 (effective June 18, 1997).

5. We acknowledge a passing reference in the Commission majority's opinion to the possibility termination would be improper even if all the charged incidents were considered. We are not convinced, given the entirety of the opinion, that this alternative rationale was meaningfully considered.

discipline is appropriate. *See Lucas*, 949 P.2d at 762 ("[T]he use of progressive discipline is committed to the [c]hief's discretion, based on the [c]hief's determination of the severity of the offense."). Given the degree of deference afforded to the fire chief's determination, the Commission may reverse the chief's choice of discipline as unduly excessive only when the punishment is "clearly disproportionate" to the offense, *In re Discharge of Jones*, 720 P.2d at 1363, and " 'exceeds the bounds of reasonableness and rationality,' " *McKesson Corp. v. Labor Comm'n*, 2002 UT App 10, ¶ 11, 41 P.3d 468 (citation omitted).

¶ 18 Utah law has provided little guidance on the precise factors used to balance the proportionality of the punishment to the offense. We have noted that an exemplary service record and tenuous evidence of misconduct may tip the balance against termination. *See Lucas*, 949 P.2d at 762. On the other hand, dishonesty, *id.*, or a series of violations accompanied by apparently ineffective progressive discipline may support termination, *see Kelly*, 2000 UT App 235 at ¶ 25, 8 P.3d 1048. Other courts have given weight to considerations of (a) whether the violation is directly related to the employee's official duties and significantly impedes his or her ability to carry out those duties; (b) whether the offense was of a type that adversely affects the public confidence in the department; (c) whether the offense undermines the morale and effectiveness of the department; or (d) whether the offense was committed willfully or knowingly, rather than negligently or inadvertently. *See* 5 *Antieau on Local Gov't Law*, § 79.11[4], [5] (2002); Eugene McQuillin, *The Law of Municipal Corporations* § 12.237 (3d ed.1999); 15A Am. Jur.2d *Civil Service* §§ 50, 65 (2000). Courts have further considered whether the misconduct is likely to reoccur. *See Skelly v. State Pers. Bd.*, 15 Cal.3d 194, 124 Cal.Rptr. 14, 539 P.2d 774, 791 (1975).

¶ 19 We reverse the Commission's order and remand the case to the Commission for further proceedings consistent with this opinion.

¶ 20 WE CONCUR: GREGORY K. ORME and WILLIAM A. THORNE JR., Judges.