**2017 UT App 186**

# THE UTAH COURT OF APPEALS

STEPHEN BURGESS,
Petitioner,

*v.*

DEPARTMENT OF CORRECTIONS AND
CAREER SERVICE REVIEW OFFICE,
Respondents.

Opinion
No. 20150170-CA
Filed October 5, 2017

Original Proceeding in this Court

Jason D. Haymore, Attorney for Petitioner

Sean D. Reyes and J. Clifford Petersen, Attorneys
for Respondent Department of Corrections

JUDGE MICHELE M. CHRISTIANSEN authored this Opinion, in
which JUDGE STEPHEN L. ROTH and SENIOR JUDGE PAMELA T.
GREENWOOD concurred.[1]

CHRISTIANSEN, Judge:

¶1     Petitioner Stephen Burgess seeks judicial review of the
Career Service Review Office's decision upholding the
termination of his employment by the Utah Department of
Corrections (the Department). We set aside that decision and

---

1. Judge Stephen L. Roth participated in this case as a member of
the Utah Court of Appeals. He retired from the court, before this
decision issued. Senior Judge Pamela T. Greenwood sat by
special assignment as authorized by law. *See generally* Utah R.
Jud. Admin. 11-201(6).

return the case for reconsideration of the discipline to be imposed.

BACKGROUND

¶2     In 2008, the Department hired Burgess as a correctional officer. A year and a half later, Burgess became a crew supervisor with the Utah Correctional Industries (UCI) division of the Department. As a crew supervisor, Burgess oversaw inmates on construction projects outside the prison. According to his immediate supervisors, Burgess excelled at his job, had an unblemished working record, and was a highly valued employee.

¶3     In December 2013, Burgess flew home to Utah after attending a professional football game in Denver, Colorado, with his friend, Fredrickson, and two other men, Summers and Passey. All four men had been drinking alcohol throughout the day, and the drinking continued during the flight home. When the men arrived at the Salt Lake City International Airport, an airport police officer in the baggage claim area noticed that Summers and Fredrickson seemed intoxicated. The officer smelled alcohol emanating from the two men and observed that "[t]hey were hanging on each other, kind of laughing. They were . . . being pretty loud and boisterous . . . and kind of stumbling." The officer watched Burgess, Fredrickson, and Summers board an airport shuttle bus headed for the economy parking lot and alerted an officer on vehicle patrol that three individuals who appeared intoxicated were on the bus.[2]

¶4     When the three men got off the bus, several airport police officers were waiting for them. After speaking with them, the officers believed that the men were intoxicated to varying

_____

2. At some point before Burgess, Fredrickson, and Summers boarded the shuttle bus, Passey parted ways with the group.

degrees. The officers determined that none of the men should be driving. One of the officers suggested the men take a taxi home to Herriman instead of driving, and the men agreed to follow the officer's suggestion. When the taxi arrived, the three men got in and the taxi started to drive away. Sometime before the taxi left the airport parking lot, the men decided that Fredrickson would drive them home instead. Fredrickson, who planned to go on a hunting trip the next day and did not want to drive two hours to retrieve his truck the next morning, assured Burgess that he was perfectly capable of driving. Though Burgess understood that "there was some risk" in getting out of the taxi, because Burgess had been with Fredrickson the entire day and had witnessed him drink only three alcoholic beverages, he agreed to let Fredrickson drive them home.

¶5 The three men then got out of the taxi and walked to Fredrickson's truck. With Fredrickson driving, they headed toward the parking lot exit; however, before they could leave the airport parking lot, the police stopped the truck, arrested all three men, and took them to the airport police station. Although Burgess did not undergo any sobriety tests, he was charged with public intoxication, a class C misdemeanor. *See* Utah Code Ann. § 76-9-701(1), (7) (LexisNexis 2012).[3] Fredrickson, however, underwent a variety of sobriety tests. He passed the "one leg stand and balance test" and the Horizontal Gaze Nystagmus eye test, but a breathalyzer test measured Fredrickson's blood alcohol concentration at .097, which was over the legal limit of .08. *See id.* § 41-6a-502(1)(a) (2010). As a result, Fredrickson was charged with and later convicted of driving under the

---

3. "A person is guilty of intoxication if the person is under the influence of alcohol, a controlled substance, or any substance having the property of releasing toxic vapors, to a degree that the person may endanger the person or another, in a public place or in a private place where the person unreasonably disturbs other persons." Utah Code Ann. § 76-9-701(1) (LexisNexis 2012).

influence (DUI). The public intoxication charge against Burgess was ultimately dropped. *See infra* ¶ 9.

¶6     Soon thereafter, Burgess reported the incident to his immediate UCI supervisor, who reported the incident to the UCI Director. Burgess did not tell his supervisor that he did not ride home in the taxi in contravention of a police officer's suggestion or that his companion, Fredrickson, had been charged with DUI. The UCI Director referred the incident to the Department's Law Enforcement Bureau (the LEB), which conducted an investigation. The LEB determined that Burgess had violated two Department policies—Policy AE 02/07, governing unlawful conduct, and Policy AE 02/11.03, governing professionalism. *See infra* ¶¶ 24, 30.

¶7     The Department conducted a disciplinary committee meeting to discuss Burgess's situation and make disciplinary recommendations. Burgess's immediate UCI supervisor presented the case to the committee. The committee discussed Burgess's public intoxication charge and concluded that a "conviction wasn't necessary for administrative reasons [to discipline Burgess] if the police officers observed signs of intoxication." The committee also discussed similar disciplinary cases, although it was not bound by the previous administration's actions.[4] A manager for the Department of

---

4. The current Executive Director of the Department was appointed in April 2013, approximately eight months before the incident with Burgess occurred. Rule R477-11-3 of the Utah Administrative Code provides that "[w]hen deciding the specific type and severity of discipline, the agency head or representative may consider . . . consistent application of rules and standards." Utah Admin. Code R477-11-3(1)(a) (2013). However, "the agency head or representative need only consider those cases decided under the administration of the current agency head." *Id.* R477-11-3(1)(a)(i). "Decisions in cases prior to the administration of the current agency head are not binding upon the current agency

(continued…)

Human Resource Management presented several of the "closest cases" he could find, but he reported to the committee that there were "no exact comparable cases since the current Executive Director had assumed his duties." The so-called "comparable cases" all involved employees who had each been charged with public intoxication and additional offenses, and at least one of the employees had been previously disciplined. Two of the employees had been terminated and one had resigned in lieu of termination.

¶8 Burgess's immediate UCI supervisor recommended to the committee that Burgess receive a punishment of time off without pay. Although the committee also discussed suspension as a possible punishment, it ultimately decided to recommend termination. According to the UCI Director, the committee's decision "ultimately . . . came down to the trust issue and the potential of being compromised as a correctional officer[;] the conduct was egregious." However, Burgess's immediate UCI supervisor and a UCI production manager later testified that the "comparable cases" involving public intoxication "swung the decision in the [committee] meeting" toward termination. On February 28, 2014, the Executive Director of the Department officially terminated Burgess for "non-compliance with and/or a violation of [Utah Administrative Code] Rule 477-9, governing standards of conduct, Utah Department of Corrections Policy . . . AE 02/07, governing unlawful conduct, and . . . Policy AE 02/11.03, governing professionalism."

¶9 Thereafter, on March 18, the public intoxication charge against Burgess was dismissed for insufficient evidence. And on July 2, the Division of Peace Officer Standards and Training (POST), which investigates allegations of misconduct against peace officers, concluded that there was insufficient evidence "to

---

(…continued)
head and are not relevant in determining consistent application of rules and standards." *Id.*

show [Burgess's] conduct constitute[d] a violation of Utah Code Ann. § 53-6-211." POST declined to seek suspension or revocation of Burgess's peace officer certification.

¶10   Burgess appealed his termination to the Career Service Review Office (the CSRO). The CSRO held a two-day step 4 hearing and affirmed the Department's disciplinary action.[5] The CSRO found that the committee's recommendation that Burgess be terminated was "largely based on his public intoxication and not a lack of trust." The CSRO determined that, "[w]hile there is substantial evidence that [Burgess] had consumed a quantity of alcohol, and had 'red glossy eyes,' and smelled of alcohol the day of the incident, substantial evidence does not support the conclusion that he was publically intoxicated." Accordingly, the CSRO concluded that, "insofar as the final decision to terminate [Burgess] was based on a finding of public intoxication, it is not sustained." The CSRO further determined that there was substantial evidence supporting the conclusion that Burgess "exercised very poor judgment by exiting the taxi and getting in [Fredrickson's] truck on the day of the incident." In addition, the CSRO determined that "[t]he final decision to terminate [Burgess] based on his poor judgment . . . when given proper deference, was neither excessive, disproportionate, nor an abuse of discretion," and that "[t]he final decision to terminate [Burgess] based on the Executive Director's lack of trust in [Burgess's] judgment is supported by substantial evidence."

¶11   Burgess filed a motion for reconsideration, which the CSRO denied. The CSRO ruled that there was substantial evidence to support the conclusion that Burgess violated Policy AE 02/07 and Policy AE 02/11.03. The CSRO also ruled that while it "would not have made the decision that the Executive

---

5. A step 4 hearing is an evidentiary hearing. *See Frequently Asked Questions*, Career Service Review Office, http://csro.utah. gov/FAQ.html#whatIsAStep4Hearing [https://perma.cc/EG88-BK4W].

Director made . . . , [it] could not substitute [its] judgment" for the Department's because "the applicable criteria [for termination had been] met." Burgess petitioned this court for review of the CSRO's decision.

ISSUES AND STANDARDS OF REVIEW

¶12    On judicial review, Burgess contends that the CSRO erred in three ways. First, he asserts that the CSRO erred in finding that he exercised poor judgment. Second, he asserts that the CSRO erred in concluding that his "conduct violated one of the Department rules/policies listed in his pre-termination notice." Third, he asserts that the CSRO erred in concluding that his termination was "not excessive, inconsistent, or disproportionate to his offense."

¶13    The CSRO is "the final administrative body to review a grievance from a career service employee and an agency of a decision regarding," among other things, "a dismissal." *See* Utah Code Ann. § 67-19a-202(1)(a)(i) (LexisNexis Supp. 2013). But the CSRO's role in examining the Department's personnel actions is a limited one. *See Career Service Review Board v. Department of Corr.*, 942 P.2d 933, 942 (Utah 1997).[6] In a step 4 hearing, the CSRO is first required to "make factual findings based solely on the evidence presented at the hearing without deference to any prior factual findings of [the Department]." Utah Admin. Code R137-1-21(3)(a) (2013). The CSRO must then determine whether "the factual findings . . . support with substantial evidence the allegations made by [the Department]" and whether "[the Department] has correctly applied relevant policies, rules, and statutes." *Id.* R137-1-21(3)(a)(i)–(ii). If the factual findings support the Department's allegations, the CSRO "must determine whether [the Department's] decision, including any

---

6. The Career Service Review Office was formerly named the Career Service Review Board.

disciplinary sanctions imposed, is excessive, disproportionate or otherwise constitutes an abuse of discretion." *Id.* R137-1-21(3)(b). "In making this latter determination, the CSRO . . . shall give deference to the decision of [the Department]." *Id.* In other words, the CSRO's authority to review departmental disciplinary actions "is limited to determining if there is factual support for the charges and, if so, whether the sanction is so disproportionate to the charges that it 'amounts to an abuse of discretion.'" *Lunnen v. Department of Transp.*, 886 P.2d 70, 72 (Utah Ct. App. 1994) (quoting *Department of Corr. v. Despain*, 824 P.2d 439, 443 (Utah Ct. App. 1991)).

¶14　Our review of the CSRO's decision falls under Utah's Administrative Procedures Act. *Kent v. Department of Emp't Sec.*, 860 P.2d 984, 985–86 (Utah Ct. App. 1993). Pursuant to the Administrative Procedures Act, "[t]he appellate court shall grant relief only if, on the basis of the agency's record, it determines that a person seeking judicial review has been substantially prejudiced by any of the following: . . . (g) the agency action is based upon a determination of fact, made or implied by the agency, that is not supported by substantial evidence when viewed in light of the whole record before the court; [or] (h) the agency action is: (i) an abuse of the discretion delegated to the agency by statute; . . . [or] (iii) contrary to the agency's prior practice." Utah Code Ann. § 63G-4-403(4) (LexisNexis 2011). Thus, we examine the CSRO's findings of fact to determine whether substantial evidence supported the Department's allegations. *See Lucas v. Murray City Civil Service Comm'n*, 949 P.2d 746, 758 (Utah Ct. App. 1997) ("The Commission's findings, upon which the charges are based, must be supported by substantial evidence [when] viewed in light of the whole record before us.").

¶15　Further, we review "an agency's application of its own rules for reasonableness and rationality, according the agency some, but not total[,] deference." *Lunnen*, 886 P.2d at 72; *see also Kent*, 860 P.2d at 986 ("In construing [Utah Code section 63G-4-403], the Utah Supreme Court has held that appellate courts

should employ an intermediate standard, one of some, but not total, deference, in reviewing an agency's application of its own rules."). We therefore "review [the CSRO's] application of its rules for reasonableness and rationality." *Kent*, 860 P.2d at 986.

## ANALYSIS

### I. Poor Judgment

¶16 First, Burgess contends that the CSRO's finding that Burgess exercised poor judgment was not supported by substantial evidence. The CSRO found that "[t]here is substantial evidence supporting the conclusion that [Burgess] exercised very poor judgment by exiting the taxi and getting in [Fredrickson's] truck on the day of the incident." "Substantial evidence is that quantum and quality of relevant evidence that is adequate to convince a reasonable mind to support a conclusion. It is more than a mere 'scintilla' of evidence and something less than the weight of the evidence." *Rosen v. Saratoga Springs City*, 2012 UT App 291, ¶ 9, 288 P.3d 606 (citation and additional internal quotation marks omitted).

¶17 Burgess contends that his decision to get out of the taxi and allow Fredrickson to drive him home was based on the facts that (1) he had a long friendship with Fredrickson and "had never observed Fredrickson drink to the point of intoxication"; (2) he had been with Fredrickson the entire day and had seen Fredrickson drink only two margaritas with lunch in Denver and one beer with dinner at the Denver airport; (3) Fredrickson had refused all alcoholic beverages on the flight to Salt Lake City; (4) Fredrickson was "perfectly steady on his feet"; and (5) "[o]nce in the cab, Fredrickson represented to Burgess that he was fine to drive." Burgess also asserts that Summers was drinking heavily throughout the trip, Summers was heavily intoxicated at the Salt Lake City airport, and Burgess "reasonably believed that it was the conduct of Summers who attracted the attention of the airport police." Thus, according to

Burgess, "[g]iven [his] history with Fredrickson, Summers['s] clear state of intoxication which attracted the attention of the police, and Fredrickson's ability to converse and walk without appearing unstable, there is not substantial evidence to conclude that [Burgess's] decision to allow his friend to drive him home showed 'very poor judgment.'"

¶18 We conclude, however, that substantial evidence supports the CSRO's finding that Burgess exercised poor judgment on the night of the incident. At the step 4 hearing, one of the airport police officers, Officer Stowell, testified that based on his interactions with Burgess, Fredrickson, and Summers in the airport parking lot, he would not have felt comfortable letting Summers drive, and he would "have had to determine a level of intoxication beyond odor of alcohol" before he felt comfortable letting either Burgess or Fredrickson drive. Officer Stowell testified that he suggested the men take a taxi "and they agreed on that. It was agreed that the taxi cab would be their ride home."

¶19 Fredrickson testified at the hearing that he told the police officers in the parking lot, "'It's probably not a good idea for us to be driving,' something to that effect." Fredrickson stated that he had been "saying whatever [he] had to say to get [the police officers] off our backs." He further testified that he had told Burgess he was supposed to go hunting in the morning, that Summers needed his medication and phone charger, and that it would take Fredrickson two hours to get to the airport and back home to Herriman, where he lived. Fredrickson testified that he "absolutely knew [he] was perfectly comfortable to drive and [he] told [Burgess], 'I know I'm 100 percent fine to drive.'"

¶20 Although Burgess testified that he never heard Fredrickson tell police officers that he should not drive and that Burgess had "no conversation with any of [the police officers] about the cab," he also testified that he had told Officer Stowell, "'We don't have a ride[.]'" Burgess testified that while they were in the taxi, he and Fredrickson decided that

Fredrickson would drive home because (1) Fredrickson had plans to go hunting the next morning, (2) Burgess and Fredrickson "talked about [Fredrickson] feeling fine, and [Burgess] had no reason to believe otherwise," and (3) Summers "complain[ed] about not having his pills and phone, phone charger, or whatever." Burgess further testified that he "understood the cops' point of view at that time" and why they had put the men in the taxi. During the hearing, counsel for the Department asked Burgess, "[W]hen you've been put by the police in the cab and you knew you'd been put in there for a reason, from their standpoint, did you think there was some risk in getting out of the cab and sending it off empty?" Burgess replied, "Of course." Counsel then asked Burgess, "Why didn't you mention that to anybody? Why didn't you say, 'Let's not take that risk. I don't want to take that risk. Let's just go home in the cab and we can come back early tomorrow morning and get your truck?'" Burgess answered, "[L]ooking in hindsight, there's just not a good answer for that." Finally, during the hearing, Burgess read a letter aloud, in which he admitted to the Executive Director, "I know my actions that night ultimately were the wrong ones—I made a very big mistake by getting out of the cab with the other two passengers." Additionally, the Executive Director testified that Burgess admitted to him that he "exercised poor judgment."

¶21   Burgess's own testimony constitutes substantial evidence from which the CSRO could base its finding that Burgess exercised poor judgment on the night of the incident. Although Burgess did not believe that Fredrickson was impaired, and he was therefore willing to let Fredrickson drive, Burgess acknowledged that he understood why the airport police officers had placed him and his companions in a taxi and, as such, he knew there was some risk in not following through with the officers' suggested course of conduct. Furthermore, Burgess admitted that he exercised poor judgment and that his actions on the night of the incident were wrong. Consequently, we conclude that substantial evidence supports the CSRO's finding that Burgess exercised poor judgment and that the CSRO's

decision on this point did not exceed the bounds of reasonableness and rationality.

## II. Violations of Departmental Policies

¶22 Second, Burgess contends that the CSRO erred in finding that his conduct violated the departmental policies cited in his pre-termination and termination notices. The Department dismissed Burgess for "non-compliance with and/or a violation of [Utah Administrative Code] Rule 477-9, governing standards of conduct, Utah Department of Corrections Policy . . . AE 02/07, governing unlawful conduct, and . . . Policy AE 02/11.03, governing professionalism."

¶23 During the relevant time frame, rule R477-9 of the Utah Administrative Code read, in pertinent part, "An employee shall comply with the standards of conduct established in these rules and the policies and rules established by agency management." *See* Utah Admin. Code R477-9 (2013). In this case, the Department specifically alleged that Burgess violated Policy AE 02/07 and Policy AE 02/11.03.

¶24 Policy AE 02/07 stated, in relevant part, "It is the policy of the Department that members conduct themselves lawfully and honestly, both on and off duty." The rationale for this policy was set forth in Policy AE2/07.02, which stated that "[b]ecause members of the Department are part of the state's criminal justice system and are accountable by the citizens for their conduct, their actions and conduct are legitimately held to a higher standard." Policy AE2/07.02 further stated that "[d]ishonest and/or unlawful behavior of members has the potential to undermine public confidence and trust in the Department and its ability to carry out its mission."

¶25 The CSRO found substantial evidence that Burgess did not conduct himself honestly on the night of the incident. Specifically, the CSRO found that

[h]onesty is not necessarily limited to whether someone is telling the truth. For instance, one may be dishonest by failure to disclose something or by a misleading response. [Burgess] was not honest in his actions when he indicated he would take a taxi, got in the taxi, but then got out of the taxi. Honesty encompasses such things as exhibiting integrity in a professional context and ensuing trustworthiness. While [Burgess] may not have violated a law in this incident, he clearly was dishonest even though he was not charged with lying. [Burgess] would be hard pressed to argue that the taxi incident exhibited his sense of honesty and reflected his trustworthiness. Honesty also means to avoid deception. [Burgess] deceived the airport police officers by allowing them to believe he would do something and then not doing it.

Based on these findings, the CSRO determined that Burgess violated Policy AE 02/07.

¶26   Burgess contends that he "agreed to get into the cab when he thought that Fredrickson—who was his ride home—was riding in the cab. When circumstances changed—i.e. Fredrickson decided to drive home—Burgess followed him." Thus, according to Burgess, "[i]t is not reasonable or rational to conclude that [he] was dishonest by getting out of the cab once he had gotten in." According to Burgess, "[i]f each and every person were fired because they initially agreed to do something, but did not follow through with their promise when circumstances changed, there would not be a qualified person left to work for [the Department]."

¶27   After examining the record, we conclude that substantial evidence supports the CSRO's finding that Burgess did not conduct himself honestly on the night of the incident. Burgess testified that he told Officer Stowell the men did not have a ride

home. Officer Stowell's testimony corroborated this; he testified that none of the men claimed to be a designated driver and that Summers stated, "'We've all been drinking.'" Accordingly, Officer Stowell suggested the men take a taxi home, to which the men agreed. When the taxi arrived, all three men got in. Burgess testified that the police officers did not ask him directly if he would get in the taxi and that he had had "no conversation with any of [the police officers] about the cab." Nevertheless, he followed Fredrickson to the taxi when it arrived. Burgess also testified that he "understood the cops' point of view at that time" and why they had suggested that the men not drive that night.

¶28 Although the record is unclear, there is some indication that Burgess and his companions, or at least Fredrickson, never intended to take the taxi home. Indeed, Fredrickson testified that he "was saying whatever [he] had to say to get [the police officers] off our backs." Furthermore, Fredrickson testified that once the taxi started to drive away, he was "thinking and talking to [Burgess], 'How the heck are we going to get out of this cab?'" Fredrickson stated that he wanted to get out of the taxi, explaining, "I wanted my truck, I wanted just to drive home. That's why I drove my truck there. It was very frustrating." And both Burgess and Fredrickson acknowledged that Fredrickson wanted to drive home because he was going hunting the next morning and it would "be two hours getting back to this airport."

¶29 In any event, the record demonstrates that Burgess, through his statements and actions, led the airport police officers to believe he would take the taxi home, yet he did not follow through with this course of conduct. This court has previously acknowledged that "[law enforcement] officers are in a position of trust and are thus held to the highest standards of behavior." *Lucas v. Murray City Civil Service Comm'n*, 949 P.2d 746, 762 (Utah Ct. App. 1997) (citation and internal quotation marks omitted). These standards are the rationale behind Policy AE 02/07, through which members of the Department are held to a higher

standard of accountability. *Supra* ¶ 24. Here, Burgess told Officer Stowell that the men did not have a ride home. And while Burgess did not expressly agree to take the taxi home, his acknowledgment that the men did not have any legal and safe alternative surely left little room for the police officers to doubt that Burgess would in fact take the taxi home. Moreover, when the taxi arrived, Burgess followed Fredrickson into the taxi without objection. Burgess testified that he understood why the police officers had suggested the men not drive themselves that evening. Thus, regardless of his subjective reasons for ultimately getting out of the taxi, the fact remains that Burgess indicated to the police officers that he would take the taxi home, which he did not do. Based on the foregoing, we conclude that there was substantial evidence on which the CSRO could, and apparently did, base its finding that Burgess did not conduct himself honestly on the night of the incident, in violation of Policy AE 02/07.

¶30    Policy AE 02/11.03 stated, in pertinent part, "No member shall act or behave privately or officially in such a manner that undermines the efficiency of the Department, causes the public to lose confidence in the Department, or brings discredit upon himself, the State of Utah or the Department." In this case, the CSRO determined that the "incident had the potential to bring discredit upon the Department in the public arena, and moreover, it did bring discredit upon [Burgess] and within the Department." Thus, the CSRO concluded, Burgess violated Policy AE 02/11.03.

¶31    Burgess contends that he "could not have been found to have brought discredit upon himself when all the officers who associated with Burgess testified that he was totally professional and totally compliant, where all the charges were dropped, and the [POST] investigation revealed no violation of policy." According to Burgess, while he "has continuously expressed regret for having ended up in a situation where he was arrested, it does not follow that he brought discredit upon himself by making the decision to trust his friend who had assured him he

was perfectly capable of driving." Thus, we consider whether there was substantial evidence to support the CSRO's finding that the "incident . . . did bring discredit upon [Burgess]."

¶32 The Executive Director testified that Burgess's decision to exit the taxi and get into Fredrickson's truck significantly undermined his confidence in Burgess. The Executive Director observed that

> the police tried to take care of [Burgess and his companions]. They put [Burgess] in a cab, sent him on his way, home safely. . . . So then the next thing is to get out of the [cab] with his friends. He could have stayed in the cab. Again, another situation showing very poor judgment.

The Executive Director testified that he was concerned that Burgess's "judgment is going to be impaired when he's managing felons in the community. . . . [W]e're talking about a sworn member of public safety. It's a different level of expectation. . . . When he's out there managing inmates, that's a big deal." According to the Executive Director, managing inmates outside the prison is "a different thing than when you have them behind walls and the bars and the cells and different things like that. It's a whole different challenge. . . . The expectation of the community is much higher when we have them out in the community and managing them around citizens and people that way."

¶33 The Executive Director further testified that, after he read Burgess's appeal letter and met with Burgess, he did not think Burgess was taking responsibility for his actions. Rather, he thought that Burgess was "blaming it away or acting as if it's not a serious offense." Ultimately, the Executive Director testified that he could no longer trust Burgess, who held a position where he was "going to be managing some of the most manipulative people in our community." The UCI Director testified similarly:

"A crew supervisor is in a position of trust particularly because the inmates are off-site. Burgess'[s] job requires rapid decision making and makes him subject to being manipulated by inmates. It came down to [a] trust issue and the potential of being compromised as a correctional officer." Based on the Executive Director's and the UCI Director's testimony, we conclude that there was substantial evidence from which the CSRO could base its finding that Burgess brought discredit upon himself, in violation of Policy AE 02/11.03.

¶34 Because we conclude that there was substantial evidence to support the CSRO's findings that Burgess violated Policy AE 02/07 and Policy AE 02/11.03, it follows that there was substantial evidence to support the conclusion that Burgess violated rule R477-9, which required employees to "comply with the standards of conduct established in these rules and the policies and rules established by agency management." *See* Utah Admin. Code R477-9 (2013). Consequently, the CSRO's decision did not exceed the bounds of reasonableness and rationality.

### III. Termination

¶35 Finally, Burgess contends that the CSRO erred in determining that his termination was not excessive, inconsistent, or disproportionate to his offense and that his "termination is not consistent with [the Executive Director's] previous application of the policies Burgess was charged with violating."[7] "In assessing whether employee misconduct warrants the sanctions imposed, this court has divided the inquiry into two prongs: (1) Is the sanction 'proportional'? and (2) Is the sanction consistent with previous sanctions imposed by the department pursuant to its own policies?" *Perez v. South Jordan City*, 2014 UT App 31, ¶ 24, 320 P.3d 42 (citation and additional internal

---

7. At the step 4 hearing, Burgess testified that he believed he deserved to be disciplined for what happened, but he disagreed with the disciplinary action taken.

quotation marks omitted); *see also West Valley City v. Coyle*, 2016 UT App 149, ¶ 29, 380 P.3d 327 ("[I]f the discipline is either not proportional to the offense *or* is not consistent with previous sanctions, a sanction may be reversed by a civil service commission or overridden by this court." (emphasis added)).

A.     Proportionality

¶36   Burgess first contends that his termination is disproportionate to his offense. When examining the proportionality of a sanction, the CSRO is restricted to determining whether an agency's sanction "is excessive, disproportionate or otherwise constitutes an abuse of discretion." Utah Admin. Code R137-1-21(3)(b) (2013). "In making this latter determination, the CSRO hearing officer shall give deference to the decision of the agency or the appointing authority." *Id.* "An agency abuses its discretion when it reaches an outcome that is clearly against the logic and the effect of such facts as are presented in support of the application, or against the reasonable and probable deductions to be drawn from the facts disclosed upon the hearing." *Sorge v. Office of Att'y Gen.*, 2006 UT App 2, ¶ 22, 128 P.3d 566 (citation and internal quotation marks omitted); *see also Lucas v. Murray City Civil Service Comm'n*, 949 P.2d 746, 761 (Utah Ct. App. 1997) ("If a penalty is so harsh as to constitute an abuse, rather than an exercise of discretion, it cannot be allowed to stand." (citation and internal quotation marks omitted)). The "[d]iscipline imposed for employee misconduct is within the sound discretion of the [agency head], which will be reversed only when the punishment is clearly disproportionate to the offense, and exceeds the bounds of reasonableness and rationality." *Sorge*, 2006 UT App 2, ¶ 31 (alterations in original) (citation and internal quotation marks omitted).

¶37   With regard to proportionality, the CSRO first determined that there was "insufficient reason to conclude that [Burgess] was publically intoxicated" and concluded that "[i]nsofar as [the Executive Director] may have terminated [Burgess] on the basis

of being publically intoxicated, that reason is not supported by 'substantial evidence.'" The CSRO observed that Burgess "had a spotless work record and was a highly regarded, valued employee with a high skill set"; that his conduct occurred while he was off duty; that his conduct "resulted in no real injury or harm"; that "[t]he public (except for the cab driver) was unaware of what happened and the inmates whom [Burgess] supervised presumably were unaware of the incident as well"; that the public intoxication charge was dismissed; and that POST declined to take any action against Burgess. Nevertheless, the CSRO ultimately concluded that Burgess's poor judgment in combination with "the Executive Director's lack of trust in [Burgess's] judgment" was sufficient to uphold the Executive Director's decision to terminate Burgess's employment. The CSRO noted that it "would not have made the decision that the Executive Director made in this case, and instead imposed a hefty suspension," but that "a hearing officer cannot substitute his or her judgment after an Agency has acted if the applicable criteria are met."

¶38　"There is no single set of factors that must be considered when conducting a proportionality review." *Coyle*, 2016 UT App 149, ¶ 30. However, in *Ogden City Corp. v. Harmon*, 2005 UT App 274, 116 P.3d 973, this court set forth several factors that may be considered in measuring the proportionality of sanctions (the *Harmon* factors), including (1) whether the employee has "an exemplary service record," (2) whether the evidence of misconduct is tenuous, (3) whether the employee has been dishonest, (4) whether there are numerous violations, (5) whether there has been "ineffective progressive discipline," (6) "whether the violation is directly related to the employee's official duties and significantly impedes his or her ability to carry out those duties," (7) "whether the offense was of a type that adversely affects the public confidence in the department," (8) "whether the offense undermines the morale and effectiveness of the department," (9) "whether the offense was committed willfully or knowingly, rather than negligently or inadvertently," and (10) whether the misconduct is likely to

reoccur. *Id.* ¶ 18; *see also Sorge*, 2006 UT App 2, ¶ 30 (applying the *Harmon* factors and concluding that the petitioner's termination was not disproportionate).

¶39 Before we address the *Harmon* factors, we consider how significant a role Burgess's public intoxication charge played in the decision to terminate his employment. As previously discussed, the CSRO determined that there was "insufficient reason to conclude that [Burgess] was publically intoxicated" and that termination on that basis was "not sustained." However, we do not believe that the effect of the public intoxication charge on the chosen sanction can simply be removed from the calculus without considering the impact on the result.

¶40 To begin with, in its written decision, the CSRO stated that the Executive Director had testified that even if Burgess had not been intoxicated, that fact "'probably would not have changed [his] mind.'" In other words, the CSRO believed that the Executive Director had testified that he would have made the same decision to terminate even without the public intoxication charge. Our review of the record has not revealed where the Executive Director expressed this sentiment. Rather, the CSRO seems to have confused the UCI Director's testimony with that of the Executive Director. Specifically, at the step 4 hearing, the UCI Director was asked, "If all of the facts remained the same in terms of what happened that night at the airport and Mr. Burgess was not actually intoxicated, would your decision have changed?" The UCI Director replied, "Probably not."

¶41 In actuality, the record demonstrates that Burgess's public intoxication charge played a significant role in the committee's sanction recommendation and in the Executive Director's final decision to terminate Burgess's employment. As previously discussed, Burgess's immediate UCI supervisor and a UCI production manager testified that the "comparable cases" involving public intoxication "swung the decision in the [committee] meeting" toward termination. *Supra* ¶ 8. They

recalled that, in the committee meeting, the UCI Director had stated that "murder is murder," meaning that "if you were intoxicated, you were intoxicated," and that Burgess should be terminated like the employees in the so-called "comparable cases." The CSRO ultimately determined that the committee's recommendation that Burgess be terminated was "largely based on his public intoxication and not a lack of trust."

¶42 More importantly, though, the Executive Director's testimony strongly suggests that Burgess's public intoxication charge was a significant factor in his decision to terminate Burgess's employment as well. Specifically, although the public intoxication charge against Burgess had been dropped for insufficient evidence by the time of the step 4 hearing, the Executive Director repeatedly referred to public intoxication as one of the reasons he chose to terminate Burgess and often listed public intoxication first when testifying. For example, the Executive Director testified that his decision was based on "a combination of the public intoxication charge, . . . that booking, but it was also . . . the decision . . . to get out of a taxi cab [and] then get into a vehicle with someone who's intoxicated." According to the Executive Director, "[t]he decision of being intoxicated in public, the decision to get out of a cab, the decision to drive with someone who's intoxicated" were all "important reasons" in his decision to terminate. He testified, "Unfortunately, in our line of work, . . . the expectation is a whole lot higher for us. And when we make that one mistake, including me, . . . if I'm arrested and I'm booked for public intoxication, I'll be gone." The Executive Director further testified, "To be booked into jail on public [intoxication], to make the decision to get into a vehicle with someone you know is intoxicated, the level has been met and the decision had to be made, so I made the decision."

¶43 The Executive Director also expressed the belief that just because the charge against Burgess was dropped, that did not mean that Burgess had not been publically intoxicated on the night in question. When asked whether he was "surprised that

the charges were dropped against Mr. Burgess," the Executive Director replied, "Not at all, not for public [intoxication]. Public [intoxication], especially if it's your first one, oftentimes they don't choose to prosecute." The Executive Director stated that it was "difficult to say what six drinks in eight hours [does] to [a person]," but that "[i]n all the searches I've done in all my time in booking, as a lieutenant, as a sergeant, as an officer, I never had someone say, 'Yep, I'm really drunk, I drank six drinks.' It's always, 'I'm not drunk and I'm not intoxicated.'" He also stated that Burgess's statement, "By no means did I feel intoxicated," did not "make much of an impression" on him because "it's not uncommon for people to say, 'I didn't feel intoxicated.'"

¶44   Additionally, Burgess's public intoxication charge appears to be the only aggravating factor distinguishing his case from another incident that occurred shortly after his termination. That incident involved another UCI crew supervisor who allowed an inmate to let a dog off its chain. The dog then got into a fight with another dog and bit an inmate who tried to separate the two animals. The crew supervisor asked an inmate to lie about the incident and falsified a police report. Shortly thereafter, the crew supervisor reported the incident to his immediate supervisor and the police report was corrected for truth. The imposed discipline for the employee was time off without pay.

¶45   The CSRO observed that the discrepancies between the dog bite incident and Burgess's discipline were "astounding" and "unfathomable." Whereas Burgess had a spotless work record and was a highly regarded employee who had "made a really stupid off duty mistake which . . . resulted in no real injury or harm," the crew supervisor involved in the dog bite incident was on duty, "acceded to an inmate's request to release a dog from a pen on [a] worksite" (which directly resulted in an inmate's being injured), asked an inmate to lie, and falsified a police report. The CSRO observed that while the dog bite incident "should have eviscerated the [Department's] trust in [the crew supervisor]," he received only a week off without pay,

while Burgess was terminated. Although we do not consider the dog bite incident in evaluating the Executive Director's consistency with previous sanctions, *infra* ¶ 54, that incident nevertheless informs our decision as to whether Burgess's sanction was proportional to his conduct, and we agree with Burgess that the dog bite incident "certainly speaks volumes as to whether exercising poor judgment was really the reason Burgess was fired."

¶46 In light of all of the circumstances, we conclude that the Department's termination of Burgess was a disproportionate sanction for his conduct. In examining the *Harmon* factors, and setting aside any consideration of Burgess's alleged public intoxication on the night of the incident, only the third, seventh, and ninth factors weigh in favor of a conclusion that Burgess's termination was proportionate to his offense. *Supra* ¶ 38. First, as previously discussed, there was substantial evidence on which the CSRO could base its finding that Burgess did not conduct himself honestly on the night of the incident. *See Ogden City Corp. v. Harmon*, 2005 UT App 274, ¶ 18, 116 P.3d 973. Second, although the public (with the probable exception of the taxi driver) was unaware of what happened, and the inmates Burgess supervised were presumably unaware of the incident as well, Burgess's disregard for the airport police officers' well-intentioned intervention is "of a type that adversely affects the public confidence" in the Department. *See id.* This is especially true where the Executive Director had been working for eighteen months to "'clean things up' and restore respectability and trust" in the Department vis-à-vis the public, and to be "a good partner in the community." Third, Burgess's decision to get out of the taxi and into Fredrickson's truck, despite his acknowledgment that he "understood the cops' point of view" and why they had suggested that he and his companions take a taxi, indicates willful and knowing disregard for the airport police officers' concerns. *See id.*

¶47 Conversely, at least four factors—the first, sixth, eighth, and tenth—weigh in favor of a conclusion that Burgess's

termination was disproportionate to his offense. First, the record is clear that Burgess had an exemplary service record with the Department. *See id.* At the step 4 hearing, the UCI Director testified that "up until this point" Burgess had been a "very good" employee and that he had always "gotten very good reviews." In addition, Burgess's immediate UCI supervisor and a UCI production manager testified that Burgess was one of the best UCI crew supervisors and that his "quality of work was great, the best we had." Second, the incident occurred while Burgess was off duty, and his conduct was not directly related to his official work duties, i.e., supervising inmates on construction projects outside the prison. *See id.* And while the loss of the Executive Director's and the UCI Director's confidence in his abilities, *supra* ¶¶ 32–33, is certainly a consequence of Burgess's conduct, this is not a case where Burgess was truly impeded from carrying out his duties because of his conduct. *Cf. Nelson v. Orem City*, 2012 UT App 147, ¶ 24, 278 P.3d 1089 (concluding that an officer's excessive use of force was "directly related to [his] official duties[,] as the violation occurred while [he] was on duty and in the normal course of [his] employment"), *aff'd sub nom. Nelson v. City of Orem*, 2013 UT 53, 309 P.3d 237; *Guenon v. Midvale City*, 2010 UT App 51, ¶ 16, 230 P.3d 1032 (concluding that "the close relationship between [the officer's] misconduct and [his] official duties" weighed in favor of a conclusion that the officer's termination was an appropriate sanction). Third, there is simply no evidence demonstrating that Burgess's conduct actually undermined the morale and effectiveness of the Department. *See Harmon*, 2005 UT App 274, ¶ 18. Finally, regarding "whether the misconduct is likely to reoccur," *see id.*, Burgess acknowledged in his letter to the Executive Director that his "decision that night was a rare moment of poor judgment" and, although not conclusive, he assured the Executive Director that the incident "became a situation that [he had] never been in before and never will again" and that "this won't happen again."

¶48   In sum, we conclude that the effects of Burgess's public intoxication charge on the ultimate decision to terminate his employment cannot be understated—the record amply

demonstrates that Burgess's public intoxication charge played a significant role in the Executive Director's decision to terminate him. Setting aside Burgess's alleged public intoxication on the night of the incident, we conclude that the CSRO's decision that termination was a proportional sanction for Burgess's violation of departmental policies was outside the bounds of reasonableness and rationality. The record shows that Burgess had an exemplary service record, and his off-duty conduct was not directly related to his official work duties or his ability to carry out those duties. Thus, termination was a disproportionate sanction for Burgess's conduct.

B.      Consistency

¶49     Burgess also contends that his termination is not consistent with the Executive Director's previous application of the policies Burgess was charged with violating. "When challenging a sanction's consistency, the disciplined employee must first make out a prima facie case by pointing to specific instances or statistics, rather than relying on an unsupported assertion of inconsistent punishment." *Perez v. South Jordan City*, 2014 UT App 31, ¶ 26, 320 P.3d 42 (citation and internal quotation marks omitted). The employee "must, at a minimum, carry the burden of showing some meaningful disparity of treatment between [himself] and other *similarly situated* employees." *Id.* (alteration in original) (citation and internal quotation marks omitted). In this case, the CSRO determined that "there are no true comparables similar enough to question the [Department's] consistency."

¶50     In support of his contention that the Executive Director acted inconsistently, Burgess directs us to one instance where the Executive Director demoted a probation officer who knew that her child had allegedly been sexually abused by the officer's husband (the child's stepfather) and consistently failed to report it, in violation of state law. The probation officer went on vacation and left the child with the stepfather. When the probation officer returned home two days after being advised by

the child's biological father that the child was being sexually abused by the stepfather, the probation officer told the stepfather to self-report the abuse. However, the stepfather did not do so, and only after the child's biological father reported the abuse was the situation addressed. The Department found that the probation officer had violated the same policies that Burgess was charged with violating. *See supra* ¶ 6. At Burgess's step 4 hearing, the Executive Director testified that the probation officer in the previous case had "exercised extremely poor judgment" and that he had lost his trust in her. However, he chose not to terminate her employment because he "didn't feel like there was enough to allow us to terminate, although [he] wished [he] could." The Executive Director explained that in making this decision, he did not feel like he had enough proof that the sexual abuse had actually occurred given "the circumstances of the case, the uncooperativeness of [the Division of Child and Family Services], the uncooperation of the agency that was involved in pressing charges against this and having any sort of proof."

¶51 Burgess contends that the probation officer's demotion in that instance and his termination in this case are "remarkably inconsistent." Burgess observes that, "even though [the Executive Director] plainly concluded that the probation officer exhibited poor judgment and lost his trust, she continues to be employed while Burgess was fired." Thus, according to Burgess, his termination was inconsistent with the Executive Director's prior disciplinary action.

¶52 We agree with Burgess that his case and the sexual abuse case are comparable. While the underlying facts are dissimilar, Burgess's case and the sexual abuse case both involve the exercise of poor judgment resulting in the Executive Director's loss of trust. And both cases involve violations of the same departmental policies. However, Burgess was fired and the probation officer was only demoted. Although the Executive Director testified in regard to the comparable incident that he "didn't feel like there was enough to allow us to terminate"

based on the lack of proof that the sexual abuse (that should have been reported) had actually occurred, the fact remains that, similar to Burgess's case, the Executive Director viewed the probation officer's actions as an exercise of "extremely poor judgment" and lost his trust in her. *Cf. Lucas v. Murray City Civil Service Comm'n*, 949 P.2d 746, 761–62 (Utah Ct. App. 1997) (observing that "dismissal for the charge of dishonesty [was] neither compelled nor supported by the record" and that "the record show[ed] that other officers disciplined solely for dishonesty were suspended rather than discharged"). Nevertheless, despite being comparable, we acknowledge that, in comparing these two cases, it is difficult to ascertain which imposed sanction is the outlier.

¶53　But Burgess also cites the dog bite incident that occurred shortly *after* he was terminated. *Supra* ¶¶ 44–45. As previously noted, the CSRO observed that while the dog bite incident "should have eviscerated the [Department's] trust in [the crew supervisor]," he received only a week without pay, whereas Burgess was terminated. However, because the incident occurred after Burgess's termination, the CSRO did not consider the incident as a past comparable in weighing Burgess's discipline, and Burgess concedes that the incident "could not be used to judge whether [his] termination . . . was consistent discipline because [it] occurred later and was not information relied upon in making the [termination] decision" in his case.

¶54　Like the CSRO, we do not consider the dog bite incident in evaluating the Executive Director's consistency with previous sanctions, because it occurred after Burgess's termination. *See* Utah Code Ann. § 63G-4-403(4)(h)(iii) (LexisNexis 2011) (providing that "[t]he appellate court shall grant relief only if, on the basis of the agency's record, it determines that a person seeking judicial review has been substantially prejudiced by any" of several enumerated agency actions, including when the agency action is "contrary to the agency's *prior* practice" (emphasis added)). Nonetheless, as previously discussed, when compared to Burgess's termination, the relatively mild sanction

imposed in the dog bite case bolsters our conclusion that the public intoxication charge played a considerable role in the decision to terminate and that Burgess's sanction was disproportionate to his offense. Although the Executive Director's disciplinary authority is discretionary, it is not unlimited, and when viewed from the lens of consistent discipline, the dog bite case demonstrates that the Executive Director's decision to terminate Burgess's employment was an abuse of discretion. *See Lucas*, 949 P.2d at 761 ("If a penalty is so harsh as to constitute an abuse, rather than an exercise of discretion, it cannot be allowed to stand." (citation and internal quotation marks omitted)).

CONCLUSION

¶55    We conclude that there was substantial evidence to support the CSRO's findings that Burgess exercised poor judgment and that he violated Policy AE 02/07 and Policy AE 02/11.03. However, we ultimately conclude that Burgess's termination was disproportionate to his offense and that the CSRO's decision to uphold the Department's termination of Burgess exceeded the bounds of reasonableness and rationality. Accordingly, we set aside the decision of the CSRO and return the case for reconsideration of the discipline to be imposed.

―――――――