**2019 UT App 70**

## THE UTAH COURT OF APPEALS

AARON LEAVITT,
Petitioner,

*v.*

SALT LAKE CITY CORPORATION AND SALT LAKE CITY CIVIL
SERVICE COMMISSION,
Respondents.

Opinion
No. 20170715-CA
Filed May 2, 2019

Original Proceeding in this Court

Erik Strindberg and Jonathan K. Thorne, Attorneys
for Petitioner

John E. Delaney and Mark E. Kittrell, Attorneys for
Respondent Salt Lake City Corporation

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES GREGORY K. ORME and DAVID N. MORTENSEN concurred.

HARRIS, Judge:

¶1     In the wake of an on-duty incident at a homeless shelter, Salt Lake City Police Sergeant Aaron Leavitt was terminated from the police force for "conduct unbecoming" a police officer. Leavitt appealed his termination to the Salt Lake City Civil Service Commission (the Commission), which affirmed the decision to terminate him. Leavitt now seeks judicial review of the Commission's decision, and we decline to disturb it.

BACKGROUND[1]

*Leavitt's Work History*

¶2     Leavitt began working for the Salt Lake City Police Department (the Department) in 1996 and, other than a one-year stint in 2002–03 at a police department in Texas, Leavitt worked continuously for the Department for nearly twenty years. At first, he was assigned to be a patrol officer, but he rose through the ranks, earning a promotion to detective in 2004 and to sergeant in 2013.

¶3     During the time Leavitt worked for the Department he was generally a good employee, and in his annual evaluations he was never rated as less than "meeting standards." He had never been the subject of serious discipline, and had never before been charged with "conduct unbecoming." However, he had been the subject of three disciplinary matters during the course of his employment with the Department. The first two matters occurred in the early years of his work for the Department and were relatively minor, involving written reprimands for poor driving and improperly caring for his shotgun. The third matter occurred in 2013 or 2014, after he had been promoted to sergeant, and was somewhat more significant: Leavitt received a sixty-hour suspension for improperly using a taser as part of a prank while working security at a professional basketball game. In September 2015, when the events giving rise to this case occurred, Leavitt held the rank of sergeant, and was only a few

---

1. The Commission made extensive findings of fact after a two-day evidentiary hearing, and we draw heavily upon those findings in reciting the facts here. Specifically, any unattributed quotations included in our factual recitation are taken verbatim from the Commission's findings.

months short of twenty years of service, a milestone that would have made him eligible to retire with full benefits.

*The Incident at the Shelter*

¶4     On the night of September 20, 2015, Leavitt was on patrol when he received a request for additional assistance near a homeless shelter (the Shelter) in downtown Salt Lake City. A few minutes earlier, another officer had stopped a group of three males—including two black juveniles (Juvenile 1 and Juvenile 2)—for "jaywalking" across the street in front of the Shelter. After stopping the group, the officer ordered them to sit on the curb so he could issue them jaywalking citations. As the officer was writing up the citations, Juvenile 1's mother (Mother) arrived on scene, and at roughly the same time Juvenile 1's sister (Juvenile 3) proceeded to jaywalk across the street and into the Shelter. Another officer ordered her to stop, but she did not comply, and so that officer followed her into the Shelter and brought her outside with the other juveniles.

¶5     All this commotion near the Shelter began to attract attention, and a crowd began to gather. Officers radioed for assistance, and Leavitt (and others) heard their call. After some discussion, Juvenile 3 was detained and placed in the back of a Department car that was parked in front of the curb, and the crowd began to dissipate. At about this point, Leavitt arrived on scene, and he observed that the situation had calmed down and "appeared to be under control." Indeed, Leavitt's first action upon arrival was to instruct dispatch to "slow everybody down," meaning that additional officers en route to the scene need not hurry to arrive. Leavitt met with the officers on scene to obtain additional information, and then set a security perimeter, gave other officers instruction, and released some officers whose presence he deemed no longer necessary. However, as Leavitt was doing so he made a series of comments—that were captured by his body camera—to other officers and to himself,

complaining about having to deal with the residents of the Shelter area, and lamenting that he could no longer get "rough" with them "like we used to" back in the day.[2]

¶6 A few minutes after making these comments, Leavitt approached the car where Juvenile 3 was detained and began talking to the officers. During the conversation, Leavitt "made a comment and pointed in the general direction" of where Juvenile 1 and Juvenile 2 had been sitting on the curb. In response, Mother began arguing with Leavitt. At about the same time, Juvenile 3 was released from the car and Leavitt confronted her by "point[ing] his finger in [her] face while lecturing her about her behavior." Leavitt then walked over to the curb and began lecturing Juvenile 2 about his behavior.

¶7 A few minutes later, after Leavitt had returned to his police car, he witnessed a group of individuals—including Juvenile 1, Juvenile 3, Mother, and other juveniles—walking on the sidewalk in front of the Shelter. Leavitt later testified that he "heard one of the juvenile males make a threat to either [Leavitt] or to other [officers] in the area."[3] Leavitt then crossed the street, by himself, to confront the juvenile who had allegedly made the threat, and a heated exchange ensued. As shown in the footage from Leavitt's body camera, which Leavitt activated as he

---

2. Specifically, Leavitt grumbled that "[h]ere we are again, and just because they won't let us do what we need to do down here, and that means get a little rough and hands on like we used to"; that "[t]here needs to be zero tolerance"; and that "[t]here's rules and if you don't follow the rules, you're going to get man handled, that's the way it is down here."

3. The threat was not captured by Leavitt's body camera because his body camera was not activated at the time the threat was allegedly made, and no other officers heard the threat.

approached the group, Leavitt first asked an unidentified male juvenile, in a challenging manner, "You got something to say now, I'm standing right here." Then, in response to a statement made by one of the individuals in the group regarding freedom of speech, Leavitt replied, "Freedom of speech isn't protected like you think it is." Following this exchange, Leavitt turned his attention to a female juvenile in the group after she said, "Get the fuck outta here nigga." Leavitt replied, "Did you tell me to get the fuck out of here nigger, is that what you just said?" The female juvenile replied, "No, nigga clean your fucking ears," after which Leavitt ended the exchange by saying "nigga" in a tone the Commission found to be "mocking."

¶8     Leavitt continued to walk alongside the group, all the while engaging the entire group—and Mother specifically—in various argumentative exchanges. After arguing with Leavitt for a few minutes, Mother directed the group to return to the Shelter. At about the same time, a female juvenile said to Leavitt, "Oh, you don't like what you're hearing," to which Leavitt responded, "No, I don't like what I hear, I don't like the disrespect from you, 'cause you're not so bad, you're not tough, you run your mouth and walk away."

¶9     By the end of this exchange the group had arrived at the Shelter doors. Leavitt, however, continued to argue with Mother and then pointed his finger directly at Mother, and then at a female juvenile, saying, "I'm gunna confront you." In response to Leavitt's actions, Juvenile 1 pointed his finger at Leavitt and—accidentally or not—poked him in the face near the eye. In response, Leavitt reached into the Shelter doorway and grabbed Juvenile 1 by the neck, sparking what the Commission described as a "melee." People inside the Shelter, including Mother and Juvenile 3—Juvenile 1's family—began to push and shove Leavitt, and a crowd gathered. In response, numerous officers ran across the street to the Shelter doorway to assist Leavitt. As officers arrived at the doorway they were surrounded by the

crowd in a confined environment, a situation the Commission described as a "fatal funnel" that jeopardized officer safety by leaving the officers subject to attack by armed individuals. The officers were eventually able to break up the melee and, after a number of minutes, they detained Juvenile 1 and Juvenile 3 and took them outside the Shelter and handcuffed them.

¶10   After the melee was contained, Leavitt returned to the street in front of the Shelter where he met with other officers and discussed, among other things, "what had transpired, what charges would be issued against the people involved, how the situation was going to be wrapped up, and whether the identity of the juvenile who allegedly made the threat was known." During these discussions, captured by Leavitt's body camera, Leavitt again made comments to other officers, and himself, about how dissatisfied he was with the current state of policing and with being told not to be "rough" with people. Among other comments, Leavitt declared:

> The degradation of the moral fabric of our community, of our world, look what's happened ever since that bullshit in Ferguson. President Clinton came—or uh Obama—not standing up and he keeps running his mouth, all of them, and the judge is saying oh, it's no big deal, thanks Baxter.[4]

*The Investigation*

¶11   Within a day or two of the Shelter melee, the Department began an investigation into Leavitt's actions that night. The investigation was formally initiated by a complaint submitted by a Department lieutenant, and Leavitt was placed on paid

---

4. The reference to "Baxter" is presumably a reference to Judge John Baxter of the Salt Lake City Justice Court.

administrative leave pending the outcome of the investigation. The investigation, conducted by the Department's Internal Affairs (IA) division, included interviews with officers who were on the scene during the incident, as well as a review of body camera footage (Body Cam Footage) from all of the officers on the scene, including Leavitt. After reviewing all the facts gathered during the investigation, and particularly Leavitt's Body Cam Footage, the head of IA determined that Leavitt "had violated Department and City policies," and issued a pre-determination notice (the Notice) setting forth facts "that illustrated the policy violations." It was not, however, up to IA to determine the level of discipline, if any, that would be imposed; that decision was solely in the hands of the Salt Lake City Police Chief (the Chief). A pre-disciplinary hearing was held shortly after the release of the Notice.

¶12    After the hearing, the Chief was required to decide whether to uphold IA's finding that Leavitt violated Department policies and, if so, what penalty would be appropriate under the circumstances. In making his decision, the Chief reviewed and considered the findings of the IA investigation, all of the Body Cam Footage, and written submissions made by Leavitt at the hearing. The Chief also considered the "impact of [Leavitt's] actions on the public trust, on the integrity of the Department, and on Department officers, including [Leavitt]." In the end, the Chief agreed with IA that Leavitt had violated Department and city policies, and concluded that the appropriate sanction, under the facts of this case, was to terminate Leavitt's employment.

¶13    Leavitt appealed the Chief's decision to the Commission. After a two-day evidentiary hearing, during which the Commission heard testimony from numerous witnesses, including the Chief and Leavitt, and reviewed numerous exhibits, including the Body Cam Footage, the Commission unanimously voted to uphold Leavitt's termination, and issued a written decision setting forth its findings and conclusions.

ISSUE AND STANDARD OF REVIEW

¶14   Leavitt now seeks judicial review, and specifically asks us to set aside the Commission's decision to uphold his termination. When reviewing the Chief's decision, the Commission "is required to give deference to the Chief, as he is best able to balance the competing concerns in pursuing a particular disciplinary action." *Harmon v. Ogden City Civil Service Comm'n* (*Harmon II*), 2007 UT App 336, ¶ 6, 171 P.3d 474 (quotation simplified). Our review, in turn, of the Commission's decision is similarly limited; indeed, we are instructed by statute to review such decisions only "for the purpose of determining if the [C]ommission has abused its discretion or exceeded its authority." Utah Code Ann. § 10-3-1012.5 (LexisNexis 2015). We will therefore not disturb the Commission's decision to uphold the Chief's decision to terminate Leavitt's employment "unless it exceeds the bounds of reasonableness and rationality." *Harmon II*, 2007 UT App 336, ¶ 6 (quotation simplified). Under this standard, "it is not this court's place to substitute its judgment as between two reasonably conflicting views" as to the appropriate punishment, "even though we may have come to a different conclusion had the case come before us for de novo review" or had we been the decisionmakers in the first instance. *See EAGALA, Inc. v. Department of Workforce Services*, 2007 UT App 43, ¶ 16, 157 P.3d 334 (quotation simplified); *see also Murray v. Utah Labor Comm'n*, 2013 UT 38, ¶ 30, 308 P.3d 461 (stating that "a discretionary decision involves a question with a range of 'acceptable' answers, some better than others, and the agency . . . is free to choose from among this range without regard to what an appellate court thinks is the 'best' answer").

ANALYSIS

¶15   In Utah cities with a population of more than 65,000, decisions about whether, and how severely, to discipline police

officers for misconduct are made in the first instance by the officers' department heads, usually the city's Chief of Police. *See* Utah Code Ann. §§ 10-3-912, -1012 (LexisNexis 2015); *see also id.* § 10-2-301(2). Where cities have established a civil service commission—and Salt Lake City has done so—a department head's disciplinary decisions may be appealed to that commission. *See id.* §§ 10-3-1003, -1012. However, upon review, commissions must choose between upholding or reversing a department head's disciplinary decisions; they may not "modify suspension or termination decisions or . . . remand such decisions for further proceedings." *Salt Lake City Corp. v. Salt Lake City Civil Service Comm'n*, 908 P.2d 871, 875–76 (Utah Ct. App. 1995) (interpreting Utah Code section 10-3-1012, and stating that a commission may only give "a simple thumbs up or thumbs down" to the department head's decision).

¶16    Accordingly, "when reviewing appeals brought by suspended or discharged employees," a civil service commission is to make two inquiries: "(1) do the facts support the charges made by the department head, and, if so, (2) do the charges warrant the sanction imposed?" *Id.* at 876 (quotation simplified). Put differently, "the Commission must first determine if discipline was warranted, and, if so, whether the discipline imposed was appropriate." *Kelly v. Salt Lake City Civil Service Comm'n*, 2000 UT App 235, ¶ 16, 8 P.3d 1048. If the Commission determines that discipline was either not warranted, or that the discipline imposed was disproportionate to the offense, it must reverse the department head's action. *Id.*

¶17    To his credit, Leavitt does not dispute that his actions at the Shelter constituted conduct unbecoming an officer, and that he therefore violated the policies under which he was charged. His challenge is focused solely on the second ground: Leavitt asserts "that the charges do not warrant the sanction imposed." *Harmon II*, 2007 UT App 336, ¶ 6, 171 P.3d 474. In assessing whether a sanction is warranted, the Commission is required to

consider two questions: "(1) Is the sanction proportional? and (2) Is the sanction consistent with previous sanctions imposed by the department pursuant to its own policies?" *Burgess v. Department of Corr.*, 2017 UT App 186, ¶ 35, 405 P.3d 937 (quotation simplified). "[I]f the discipline is either not proportional to the offense or is not consistent with previous sanctions, a sanction may be reversed by [the Commission] or overridden by this court." *West Valley City v. Coyle*, 2016 UT App 149, ¶ 29, 380 P.3d 327.

¶18    In support of his position that termination was too strong a sanction in this case, Leavitt argues that his punishment was both disproportionate and inconsistent with sanctions levied by the Department in previous cases, and in addition argues that his termination was improper because the Department failed to comply with certain procedural requirements when it terminated him. We address each of Leavitt's arguments in turn.

A

¶19    Leavitt first contends that termination is a penalty disproportionate to his offense. In *Ogden City Corp. v. Harmon* (*Harmon I*), 2005 UT App 274, 116 P.3d 973, this court identified a nonexclusive list of factors—known as the *Harmon* factors—that may be considered in determining the proportionality of a sanction:

> (1) whether the employee has "an exemplary service record," (2) whether the evidence of misconduct is tenuous, (3) whether the employee has been dishonest, (4) whether there are numerous violations, (5) whether there has been "ineffective progressive discipline," (6) "whether the violation is directly related to the employee's official duties and significantly impedes his or her ability to carry out those duties," (7) "whether the

offense was of a type that adversely affects the public confidence in the department," (8) "whether the offense undermines the morale and effectiveness of the department," (9) "whether the offense was committed willfully or knowingly, rather than negligently or inadvertently," and (10) whether the misconduct is likely to reoccur.

*Burgess*, 2017 UT App 186, ¶ 38 (quoting *Harmon I*, 2005 UT App 274, ¶ 18). This nonexclusive list of factors is not to be rigidly applied; indeed, "[t]here is no single set of factors that must be considered when conducting a proportionality review." *Coyle*, 2016 UT App 149, ¶ 30. The *Harmon* factors are merely aids in determining whether the sanction imposed was proportional.

¶20   Applying the *Harmon* factors to the case at hand, the Commission determined that Leavitt's termination was proportional to his conduct, and we discern no abuse of discretion in that determination. The Commission's analysis was based on its findings that a number of the *Harmon* factors weighed in favor of a stern punishment. And although the Commission did not specifically cite each *Harmon* factor, its findings are amply supported by the record evidence.

¶21   For example, the Commission's findings demonstrate that it considered whether the Chief had properly weighed Leavitt's service record when terminating Leavitt. *See Harmon I*, 2005 UT App 274, ¶ 18. The Commission specifically recognized that Leavitt's service record was good, that his annual evaluations had been generally favorable, and that he had received multiple letters of commendation. However, the Commission also recognized that Leavitt had been the subject of several disciplinary matters, including a more significant violation a year or two before the incident in question. Moreover, the Commission also gave weight to the Chief's testimony on the issue, in which he stated that Leavitt's past service record could

not "make up for the egregious nature of [Leavitt's] conduct on that night," and that during his twenty-six-year police career, the Chief had never "seen behavior such as that demonstrated by [Leavitt] on the night of [the incident]."

¶22 The Commission's findings also address whether Leavitt's violation is directly related to his official duties, and whether it significantly impeded his ability to carry out those duties. *See id.* Moreover, Leavitt himself concedes that this factor weighs in favor of substantial discipline, because the violation related directly to his official duties, and the way he handled the situation impeded his ability to perform those duties.

¶23 The Commission also made findings regarding the effect Leavitt's actions had, or could have, on the public's perception of and confidence in the Department, as well as the effect on the morale and effectiveness of other officers in the Department. *See id.* Based on the record evidence, the Commission concluded that the Chief's decision to terminate Leavitt was based in part on the Chief's evaluation of "the impact of [Leavitt's] actions on the public trust, on the integrity of the Department, and on Department Officers, including [Leavitt]." Specifically, the Commission was persuaded by the Chief's testimony that Leavitt's "admitted misconduct adversely affected the public confidence" in the Department, and that if Leavitt's Body Cam Footage were to be aired on the local news or posted on the internet it could significantly impact "the Department's reputation within the community" and "cause lasting damage to the Department." The Chief also testified that these potential consequences would necessarily impact the morale and effectiveness of the Department because Leavitt's actions directly reflect on the integrity and character of each Department officer. Although Leavitt resists the Chief's conclusion on this point, and contends that it is nothing more than speculation, we are unable to conclude that the Commission abused its discretion in deciding to credit the Chief's testimony on this point.

¶24 Finally, the Commission considered whether the offense was committed willfully or knowingly. *See id.* For example, the Commission credited the Chief's testimony "that he believed [Leavitt's] actions on the night of [the incident] were not simply negligent or inadvertent," but rather "it seemed like [Leavitt] was looking for a fight, that his actions were calculated, that [Leavitt] knew what was going on in this situation, and that the situation was not spontaneous because it developed over time and [Leavitt] engaged in verbal altercations that escalated the situation, confronting one person after another." Moreover, the Commission also credited Leavitt's own testimony that "his misconduct was at least influenced by his frustration that the Department had, in recent years, gotten away from what he thought was a more effective policing method." Thus, the Commission concluded that several *Harmon* factors militate in favor of a harsh punishment and, because that conclusion was supported by record evidence, it was not an abuse of discretion.[5]

¶25 A few *Harmon* factors support the opposite view, and Leavitt points hopefully to those factors as support for his position. For example, Leavitt notes that he has always been honest about his misconduct, and that he has even conceded that his conduct violated Department policies. *See Harmon I*, 2005 UT App 274, ¶ 18. He also highlights the fact that his termination was the result of only one incident, rather than multiple violations occurring on various occasions. *See id.* And because Leavitt had not engaged in serious misconduct prior to the incident in question, there had been no "ineffective progressive discipline." *See id.*

---

5. In addition, although the Commission did not expressly mention it, it is evident that the second *Harmon* factor—whether the evidence of misconduct is tenuous—also weighs in favor of a stern sanction in this case. Here, not only was the conduct almost entirely captured on video, but Leavitt admitted wrongdoing.

¶26 However, not all the *Harmon* factors have to weigh in favor of stern punishment for the Commission's decision to be reasonable. In instances like this one, in which some factors cut in one direction and others in another, the Chief had several reasonable alternatives from which to choose. We will not disturb the Commission's decision to affirm the Chief's choice unless it "exceeds the bounds of reasonableness and rationality." *Harmon II*, 2007 UT App 336, ¶ 6 (quotation simplified); *see also Murray v. Utah Labor Comm'n*, 2013 UT 38, ¶ 30, 308 P.3d 461 (stating that "a discretionary decision involves a question with a range of 'acceptable' answers, some better than others, and the agency . . . is free to choose from among this range without regard to what an appellate court thinks is the 'best' answer").

¶27 In sum, the Commission rationally and reasonably determined that the Chief's decision to terminate Leavitt was proportionate to his offense. Although the Commission did not make a finding on every *Harmon* factor in reaching its decision, it was not required to do so. *See Coyle*, 2016 UT App 149, ¶ 30. And although the Chief could have imposed a lesser sanction on Leavitt, based on the record evidence, the Commission did not abuse its discretion in concluding that the Chief's decision did not "exceed[] the bounds of reasonableness and rationality." *Harmon II*, 2007 UT App 336, ¶ 6 (quotation simplified).

B

¶28 Leavitt next contends that his termination is not consistent with prior discipline imposed on other officers for the same offense. In support of this argument, Leavitt points to "comparable" information about five other officers who violated the same policy as Leavitt—"conduct unbecoming"—but had received a lesser sanction than termination.

¶29 When challenging a sanction's consistency, the "burden of establishing inconsistent discipline rest[s] with [the disciplined

employee] at the Commission level." *West Valley City v. Coyle*, 2016 UT App 149, ¶ 37, 380 P.3d 327. The employee "must first make out a prima facie case by pointing to specific instances or statistics, rather than relying on an unsupported assertion of inconsistent punishments." *Kelly v. Salt Lake City Civil Service Comm'n*, 2000 UT App 235, ¶ 30, 8 P.3d 1048. And while "our case law does not require comparison to identically situated employees," *Coyle*, 2016 UT App 149, ¶ 37, it does require the employee to show "some meaningful disparity of treatment between himself and other *similarly situated* employees," *Burgess v. Department of Corr.*, 2017 UT App 186, ¶ 49, 405 P.3d 937 (quotation simplified).

¶30    Here, Leavitt offered as evidence information on five "comparable" cases in an attempt to demonstrate the inconsistency of his discipline for "conduct unbecoming." In exhibits submitted to the Commission, Leavitt describes instances where five other officers were charged with "conduct unbecoming," each resulting in a lesser discipline than termination. For each example, Leavitt provided a brief description of the officer's actions and the discipline received.[6]

---

6. The first officer received twenty hours without pay after making a threatening and profane comment ("watch your back asshole") to a civilian while on duty at a professional baseball game in Salt Lake City. The second officer received verbal counseling after referring to a black man as "boy" and making lewd comments about the size of the man's genitalia. The third officer received a ten-hour suspension after making comments to someone insinuating that he or she was involved in criminal conduct. The fourth officer, a sergeant, received a letter of reprimand after using threatening language during a phone conversation with another officer. The fifth officer received a

(continued…)

¶31 After reviewing this evidence, the Commission concluded that Leavitt "failed to offer sufficient evidence to show that the sanction imposed on him was inconsistent with the discipline imposed on other similarly situated officers." In reaching this conclusion, the Commission found that the evidence Leavitt offered was inadequate because Leavitt had not demonstrated that the officers in the "comparable" cases were "similarly situated officers." The Commission reasoned that

> (1) the alleged "comparable" examples offered by [Leavitt] involved patrol officers, not officers holding the rank of Sergeant or above;[7] (2) none of [Leavitt's] examples involved a command officer who engaged in verbal altercations through loud and inappropriate language, confronting one person after another, including minors, for such an extended period of time; and (3) none of the

---

(…continued)
letter of reprimand—that was later withdrawn—after engaging in a public dispute with a civilian.

7. Leavitt correctly notes that the Commission erred on this point, inasmuch as one of the five comparable cases Leavitt offered involved an officer holding the rank of sergeant. However, the Commission's error on this point does not invalidate its ultimate finding because Leavitt cannot show that the error mattered, i.e., that a contrary finding would have changed the outcome. *See Ha v. Trang*, 2016 UT App 155, ¶ 12, 380 P.3d 337 ("On appeal, the appellant bears the burden of showing not only that an error occurred, but that it was substantial and prejudicial." (quotation simplified)). Other than the rank of the officer ("sergeant") and the charge ("conduct unbecoming"), the facts of that episode are not at all factually similar to the incident at issue here.

> examples . . . involved the escalation of a situation that had already calmed down, doing so in a very difficult part of the city, involving such a large number of people, and that put the safety of other Department Officers at risk.

In addition, the Commission also found that Leavitt had not introduced sufficient evidence "about the tenure or prior disciplinary histories" of the officers in the "comparable" cases, and therefore it was unable to determine the extent to which the other cases were (or were not) similar to Leavitt's.

¶32    We discern no abuse of discretion in the Commission's conclusions. The "comparable" information Leavitt presented to the Commission was insufficient to establish a prima facie case of inconsistent discipline. As this court has recognized, "[a] disciplined employee must do more than show that other employees received lighter punishments for similar offenses. The disciplined employee must identify employees in similar circumstances—employees with similar disciplinary histories and service time, for example—who received lighter punishments for similar offenses." *Perez v. South Jordan City*, 2014 UT App 31, ¶ 30, 320 P.3d 42; *see also Phillips v. South Jordan City*, 2013 UT App 183, ¶ 18, 307 P.3d 659 (rejecting an employee's argument that his termination was inconsistent when the employee failed to include "the performance histories or length of service . . . which information may explain or justify the lesser discipline"). Here, Leavitt has not provided information that we have previously recognized as being crucial to demonstrate inconsistent discipline, such as the "disciplinary histories and service time" of the officers offered as "comparable" examples. *See Perez*, 2014 UT App 31, ¶ 30; *see also Phillips*, 2013 UT App 183, ¶ 18 (recognizing that "detailed information pertinent to a determination of whether the circumstances (not just the actions) of other

officer sanctions were similar" is important in determining whether a sanction is inconsistent).[8]

¶33 Moreover, based on the limited "comparable" information Leavitt did provide, the conduct of the officers in the other cases appears to be vastly different from Leavitt's conduct here. While each was accused of "conduct unbecoming," that is a category encompassing such a wide range of potential conduct that—in this case—mere reference to an identical charge does not by itself demonstrate similarity. *See Nelson v. Orem City*, 2012 UT App 147, ¶ 27, 278 P.3d 1089 ("Meaningful disparate treatment can only be found when similar factual circumstances led to a different result without explanation." (quotation simplified)), *aff'd*, 2013 UT 53, 309 P.3d 237. The conduct exhibited by the officers in the five "comparable" situations is not similar enough to the incident in question. None of the "comparable" officers had engaged in extended verbal altercations, had antagonized and harassed juveniles, had needlessly escalated a situation that had already calmed down, had jeopardized officer safety, or had made repeated comments about wanting to get "rough" with people.

¶34 On this record, we conclude that the Commission's determination that Leavitt had failed to carry his burden of proving disparate treatment was not an abuse of discretion. The Commission engaged in a thorough analysis of the evidence—including the "comparable" evidence offered by Leavitt—and reasonably concluded that Leavitt had not made the required showing.

---

8. Leavitt does not contend that he was unable to obtain information about comparable cases from the City upon request. Indeed, Leavitt admits that he "sent several letters to the City asking for 'comparator' information" and that the City produced the information he requested.

C

¶35 Finally, Leavitt contends that the Chief failed to strictly follow Department procedures in making his disciplinary decision, and asserts that the Commission abused its discretion by overlooking those procedural violations. Leavitt identifies three alleged procedural violations.

¶36 First, Leavitt contends that the Chief failed to comply with the requirements of an agreement (the MOU) between the Salt Lake Police Association and the Department setting forth certain procedural rights that are to be afforded to officers during an investigation that can result in discipline. Article 15 of the MOU provides that the "[p]ersons deciding the disposition of an investigation may not be the person who made the initial allegation(s), either directly or indirectly." Leavitt argues that this article was violated because the Chief—who was ultimately responsible for deciding Leavitt's disposition—was also the person who made the initial complaint. Leavitt alleges that the Chief "hid[] the fact that [the Chief] was the [original] complainant" by instructing another officer to sign the form that "formally" started the investigation. We are not persuaded. As established by the Commission in its factual findings, which Leavitt does not contest, a Department lieutenant—*not* the Chief—submitted the initial complaint against Leavitt. The Commission was unwilling to find that the Chief had made the initial complaint, either directly or indirectly, and Leavitt does not challenge that finding. Affording appropriate deference to that finding disposes of Leavitt's argument: the lieutenant who submitted the initial complaint was not responsible for making the final decision to terminate Leavitt's employment, and there was therefore no violation of the MOU.

¶37 Second, Leavitt argues that the Chief violated both Salt Lake City Ordinance 2.72.210 (the Ordinance) and Salt Lake City Police Department Policy IV-050 (the Policy) by making his final

decision to terminate Leavitt before the Chief had reviewed the report from a Citizen Review Board (CRB). Both the Ordinance and the Policy require the Chief to review and consider the CRB report prior to making a decision about discipline. Leavitt correctly points out that the Chief violated both the Ordinance and the Policy inasmuch as he did not review the CRB report— dated March 9, 2016—prior terminating Leavitt on February 22, 2016. However, Leavitt has not shown how this procedural infirmity could possibly have been harmful. *See Lucas v. Murray City Civil Service Comm'n*, 949 P.2d 746, 754–55 (Utah Ct. App. 1997) (stating that a party asserting procedural violations in this context must show "how these procedures would have resulted in a different outcome" had they been followed).

¶38    As an initial matter, it is important to note that, while the CRB is asked to weigh in on whether it believes the officer in question violated the relevant standards, it is not asked to offer any recommendation regarding appropriate punishment. Moreover, in this case the CRB sustained the allegations against Leavitt, specifically finding that Leavitt engaged in conduct that violated the Department's "conduct unbecoming" policy. Thus, Leavitt has not shown that it would have made any difference if the Chief had waited an additional two weeks to review a report that aligned with his determination as to whether a violation occurred, and that made no recommendation about discipline.

¶39    Finally, Leavitt points again to the Policy, which requires that all serious allegations of alleged misconduct must be investigated by IA, and that, following the conclusion of the IA investigation, IA's findings are to be forwarded to a Bureau Commander for review. In the event the complaint is sustained, "the Bureau Commander will make a recommendation of disposition to the Chief." But it remains the Chief's ultimate prerogative to make the final determination as to the level of discipline. Leavitt correctly points out that the Policy was not strictly followed because, after IA completed

its investigation, its findings were never sent to an independent Bureau Commander for review, and an independent recommendation for discipline was never made. While we do not condone the failure to strictly follow the Policy, we do not discern any abuse of discretion on the part of the Commission in stating that it did "not find [Leavitt's] arguments on this point persuasive." Based on Leavitt's testimony at the hearing that he violated the Department and City policies for which he was charged, as well as the Body Cam Footage, there is no doubt that IA's identical finding was accurate. Moreover, Leavitt fails to identify any specific way in which this particular procedural infirmity harmed him, since even if the Bureau Commander had made a disciplinary recommendation, the Chief was not bound to follow it or even defer to it; indeed, Leavitt does not contest the fact that, under applicable law, the Chief alone makes the final decision as to discipline.

CONCLUSION

¶40    When the Chief made his initial decision about which punishment to impose upon Leavitt for his admitted violations of Department policies, he could have selected any one of several options. For instance, and among other things, he could have opted to impose a sanction that at least allowed Leavitt to remain employed—at a desk job, if necessary—for a few more months until he reached the twenty-year milestone. For well-articulated reasons, however, the Chief elected to terminate Leavitt immediately, and the Commission upheld that decision. Our authority to review this case is circumscribed: the question presented is not whether we would have done the same thing had we been in the Chief's shoes; instead, our review is limited to consideration of whether the Commission abused its discretion in upholding the Chief's decision to terminate Leavitt.

And we discern no such abuse of discretion. Accordingly, we decline to disturb the Commission's decision.

———————