2024 UT App 134

## THE UTAH COURT OF APPEALS

NISHA KOY ELKINGTON KING,
Petitioner,

*v.*

PROVO CITY CIVIL SERVICE COMMISSION,
Respondent.

Opinion
No. 20230503-CA
Filed September 19, 2024

Original Proceeding in this Court

Steven C. Tycksen, Attorney for Petitioner

J. Brian Jones, Gary D. Millward, and Richard A.
Roberts, Attorneys for Respondent

JUDGE AMY J. OLIVER authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and JOHN D. LUTHY
concurred.

OLIVER, Judge:

¶1 Nisha Koy Elkington King seeks judicial review of the Provo City Civil Service Commission's (the Commission) decision upholding her termination from the Provo City Police Department (Police Department). King argues that the Commission improperly investigated sexual harassment complaints against her pursuant to Provo City's (Provo), rather than the Police Department's, policy. King also argues that the charges against her were not supported by substantial evidence and that the Commission abused its discretion by upholding the termination. Because King has failed to show that she was harmed by the policy choice made, and because we conclude that the Commission's findings are supported by substantial evidence, we decline to disturb the Commission's decision.

BACKGROUND

¶2 King was a sergeant with the Police Department in August 2022 when her employment was terminated by Provo's police chief (the Chief). King's termination resulted from an investigation into two allegations of sexual harassment against her. The initial incident that spurred the investigation occurred on July 2, 2022, when King and several other officers were assigned to retrieve flags from the Provo mayor's old office and transport them to the new city building. As the assigned officers moved the flags and flag stands, King picked up two round flag stands, held them up to her chest, and jokingly asked the officers, "What if I hold these like this?" "Would that be inappropriate?" According to one of the officers (Officer 1), the comment made him feel "awkward and uncomfortable." King then said, "Good thing I'm with the S[pecial] V[ictims] U[nit] guys." Another assigned officer helping with the flags (Officer 2) described being "disturbed with [King's] insinuation that [he] would be comfortable with this type of behavior because of his job as a sex crimes detective." When Officer 1 and Officer 2 (collectively, the Officers) reported King's actions, the Provo mayor, the Chief, and a Provo attorney consulted and then assigned the matter to Provo's human resource director (the Director) for investigation, pursuant to Provo's Personnel Policy 31 (Policy 31), which governs sexual harassment complaints against Provo employees, *see* Provo Personnel Policy 31 (2019).

¶3 During the Director's investigation, another allegation of sexual harassment against King came to light. Lydia,[1] a victim services program coordinator for Provo, was washing a dish at work in the break room's sink when King came up behind her and "aggressively cupped her buttocks" with her hands. When Lydia turned around, King responded, "Sorry, I couldn't help myself." Lydia was "embarrassed, shocked, and confused" by the incident

---

1. A pseudonym.

and returned to her desk looking "white as a ghost," according to her coworkers. When they pressed her about whether she was okay, Lydia told them what had happened and "asked them not to tell." Lydia did not report the incident because she was afraid of retaliation or of losing her job, but she did mention the incident to the Officers a couple of months before the flag incident.

¶4      On July 6, 2022, King was placed on administrative leave. The letter placing her on leave explained that the Police Department had received "multiple sexual harassment reports involving" her over the last twelve months and that Provo's human resources department was handling the investigation.

¶5      The Director and the Chief then conducted separate interviews with King. The Director explained to King that there was a sexual innuendo allegation against her: the Officers reported King had asked them, "Should I go out there like this?" as they were carrying the flags down the stairs. In response to the Director telling King there was video footage that recorded her making the statement, King claimed that "she believed [the Director] if it was on a video, but she didn't have any recollection." But according to the Director, King "was able to offer . . . other small details that were [in the video]," including which officer carried the most flags. The Director asked if there was "any other explanation as to why [she] might have made that comment," but King offered no explanation other than "she was overwhelmed with school and things going on in her life and she didn't remember."

¶6      The Director also explained to King that there was an allegation against her of inappropriate touching that came to light when the Officers said that "they had heard things . . . that had happened with [King] and other individuals that made them concerned that they were seeing a pattern of behavior." The Director had asked them to clarify, and the Officers recounted what Lydia had told them. King adamantly denied that the

incident occurred. In her interview with the Chief, King again declared she "did not grab the buttocks of [Lydia]" and did not "hold up the flag stands insinuating anything sexual."

¶7      Around August 8, King was notified that the Ogden City Police Department was conducting a criminal investigation into the incident involving Lydia.[2] King requested her pretermination hearing be delayed until the criminal investigation was concluded so she could speak freely at the hearing and not risk violating "her [Fifth] Amendment rights against self-incrimination." The Provo attorney responded that King's statements "in an internal disciplinary proceeding would be covered by *Garrity*[3] and therefore could not be used against her in a criminal proceeding."

¶8      The pretermination hearing took place on August 10, as scheduled, and King denied both allegations against her. The Director concluded that there was sufficient evidence to support the allegations and that "King's responses to [him] suggested dishonesty." Specifically, the Director described how video and audio footage of the officers removing the flags from the mayor's office captured King easily lifting up the flag stands and coming

---

2. The Ogden City Police Department investigated the matter to avoid any conflict of interest. On August 23, 2022, the Weber County Attorney's Office declined to prosecute the case against King for insufficient evidence.

3. Named after *Garrity v. New Jersey*, 385 U.S. 493 (1967), in which the United States Supreme Court held that "a police officer's statements obtained under threat of removal are inadmissible in subsequent criminal proceedings," a *Garrity* warning is routinely used by police departments to advise "officers who are the subject of an internal investigation that their answers will not be used in any criminal prosecution." *Hoffman v. Peace Officer Standards & Training Council*, 2022 UT App 34, ¶¶ 12–13, 507 P.3d 838 (cleaned up).

down the stairs saying, "Should I walk out there like this?" and Officer 2 responding, "No, that wouldn't be good."[4] The Director explained that he "found it very difficult to believe that [King] was able to remember all other aspects" of the flag incident, including which officer carried the most flags, but not her own comments and actions.

¶9     On August 17, the Chief terminated King from the Police Department. As to the touching incident, the Chief found that "termination [was] the appropriate discipline" because King "engaged in misconduct, violated city policy, and lied about it." As to the flag incident, the Chief found that although King's behavior "constituted inappropriate sexual innuendo," the behavior "was not severe enough to constitute [h]arassment." But the Chief also concluded that King's dishonesty in lying about the incident warranted termination "due to the critical nature of maintaining credibility" as a police officer.

¶10     King timely appealed to the Commission. In part, King challenged Provo's use of Policy 31, asserting that the investigation should have been conducted pursuant to Provo Police Department Policy 1010 (Policy 1010), which would have provided her with a number of additional protections, including, among others, (1) "[a]ccess to all of the materials considered by the Chief of Police in recommending the proposed discipline," Provo, Utah Police Department Policy Manual § 1010.11.2 (2022); (2) the right to "have an uninvolved representative present" during her interviews, *id.* § 1010.7.2(i); (3) having the investigation conducted by a member of the Police Department, *see id.*

---

4. The video footage captured a total of two minutes' worth of the Officers removing the flags in the mayor's office and then going down the stairs with them. King was not visible when she made the comments, but she emerged into the camera frame on the stairs as she was lowering the flag stands from "up around her chest."

§§ 1010.7.1, 1010.10; and (4) having all witness statements recorded, *see id.* § 1010.7.2(h).[5]

¶11    The Commission held a hearing on March 14, 2023. At the hearing, the Commission heard testimony from the Chief, the Director, the Officers, King, Lydia, and Lydia's coworkers about the incidents and investigation as recounted above.

¶12    The Chief testified that he reviewed the Director's report, viewed the videos from the flag incident, met with King before the pretermination meeting, and interviewed Lydia before making his decision. He decided to terminate King because she "engaged in misconduct, violated [Provo's] policy, and lied about it." Of most concern to the Chief was King's dishonesty because "in the profession of policing . . . [h]onesty is paramount."

¶13    The Director testified that one of his duties as the director of human resources is to investigate sexual harassment allegations. In response to King's assertion that Policy 1010—not Policy 31—governed the investigation, the Director described Policy 31[6] as "the umbrella policy for [Provo]," and he explained that his "interpretation of Policy 1010[7] [was] that it has to be

---

5.    The parties disagree about whether "an uninvolved representative" includes an attorney. We assume, for purposes of our analysis, that "an uninvolved representative" includes an attorney in the context of Policy 1010.

6. Policy 31 states, in relevant part, "All complaints of harassment will be investigated by Human Resources, the legal department, or by outside counsel, depending on the circumstances of the report." Provo Personnel Policy 31-7(A) (2019).

7. Policy 1010 "provides guidelines for the reporting, investigation and disposition of complaints regarding the conduct
                                                        (continued…)

consistent with [Policy 31]." The Director agreed Policy 1010 "could apply to investigations the police department conducts within its department" but reiterated Policy 31 "applies city wide." When asked if he interviewed King "under *Garrity*," he confirmed that he did and explained that "*Garrity* is protection of government workers from incriminating themselves in a criminal investigation," which is needed because it is also "designed so that employees are compelled to answer questions truthfully and their refusal to answer questions can result in their immediate termination." As to the flag incident allegation, the Director concluded that it "happened as described by [the Officers]." He stated, "I heard the comment, I saw the action" on the video. When the Director asked King about the inappropriate touching incident, she denied it. King's dishonesty about the flag incident "cast into question her credibility" on the touching allegation.

¶14 After the video footage of the flag incident was played at the hearing, King was asked to explain what she said and did on the video. She replied, "I clearly made the statements that I made, and you can see the motions that I made in the video, and I—I'm not going to deny that." She insisted she did not lie to the Director

---

of members of the Provo City Police Department." Provo Police Department Policy Manual § 1010.1 (2022). Under that policy, "[p]ersonnel complaints may be generated internally or by the public," *id.* § 1010.4, and "complaint forms will be maintained in a clearly visible location in the public area of the police facility and be accessible through the department website," *id.* § 1010.5.1. Policy 1010 also provides that supervisors must promptly contact "the Department of Human Resources and the Watch Commander for direction regarding the supervisor's role in addressing a complaint that relates to sexual, racial, ethnic, or other forms of prohibited harassment or discrimination." *Id.* § 1010.7.1(e).

or the Chief when she denied making the statement, explaining that she simply could not "recall even saying it."

¶15 After the hearing, the Commission affirmed the Chief's decision to terminate King. Among its findings were the following determinations:

- Policy 31 "applies to all departments of [Provo]; and . . . it applies to all employees, including police officers."

- King "was provided with a full and fair [h]earing," along with "a full and fair opportunity to dispute and otherwise be heard."

- Provo had "proved there is substantial evidence to affirm" King's termination from the Police Department.

- King's "failure to recall the [flag] incident" in her interviews with the Director and the Chief "evidenced a lack of forthrightness and candor that could be characterized as being dishonest," especially when King "continued to refuse to acknowledge her lack of candor even when confronted with video evidence at the [h]earing."

ISSUE AND STANDARD OF REVIEW

¶16 King now seeks judicial review, asking us to set aside the Commission's decision to uphold her termination. A civil service commission established by a city may review its department heads'—including the police chief's—disciplinary decisions. *See Leavitt v. Salt Lake City Corp.*, 2019 UT App 70, ¶ 15, 442 P.3d 1217. A commission's review is deferential. *See id.* ¶ 14 ("When reviewing the Chief's decision, the Commission is required to

give deference to the Chief, as he is best able to balance the competing concerns in pursuing a particular disciplinary action." (cleaned up)). This court's review of a commission's decision is "similarly limited" by statute, which instructs us to "review such decisions only 'for the purpose of determining if the Commission has abused its discretion or exceeded its authority.'" *Id.* (quoting Utah Code § 10-3-1012.5). Therefore, we will "not disturb the Commission's decision to uphold the Chief's decision to terminate [King's] employment unless it exceeds the bounds of reasonableness and rationality." *Id.* (cleaned up).

## ANALYSIS

### I. Harmless Error

¶17 King contends it was "arbitrary and capricious" and, thus, an abuse of discretion for the Commission to uphold Provo's decision to follow Policy 31 instead of Policy 1010. Citing the Utah Administrative Procedures Act (UAPA), *see* Utah Code §§ 63G-4-101 to -601, she argues that the decision to follow Policy 31 "caused substantial prejudice and denial of [her] due process" rights. But this statute does not apply here. A civil service commission "is a local, municipal tribunal of limited jurisdiction" that "is neither a court of law nor a state administrative agency subject to [UAPA]." *Lucas v. Murray City Civil Service Comm'n*, 949 P.2d 746, 755 (Utah Ct. App. 1997). Instead, a civil service commission is governed by the Utah Municipal Code. *See* Utah Code §§ 10-3-10, 10-3-1001 to -1013. Thus, King's reliance on UAPA, which addresses "arbitrary and capricious" agency action and provides for a "substantial prejudice" standard of review, is misplaced for a challenge to a municipal tribunal's action. The appropriate standard of review here is whether the Commission "has abused its discretion or exceeded its authority." *Id.* § 10-3-1012.5.

¶18 Applying that standard, we discern no abuse of discretion in the Commission's decision upholding the use of Policy 31 instead of Policy 1010 in the investigation of King's misconduct because King has not demonstrated that she was harmed by the alleged error. "We will not disturb a ruling alleged to be erroneous unless the petitioner demonstrates the error is prejudicial." *West Valley City v. Coyle*, 2016 UT App 149, ¶ 17, 380 P.3d 327 (cleaned up); *cf. In re Estate of Valcarce*, 2013 UT App 95, ¶ 37, 301 P.3d 1031 (finding no abuse of discretion in a trial court's denial of a motion where the "trial court's rationale for denying the motion" was "reasonably support[ed]" and where the appellant "failed to show how his attorney's actions or the trial outcome would have been any different").

¶19 King argues that Policy 1010 would have provided her with a number of additional protections, including, among others, (1) "[a]ccess to all of the materials considered by the Chief of Police in recommending the proposed discipline," *see* Provo Police Department Policy Manual § 1010.11.2 (2022); (2) the right to "have an uninvolved representative present" during her interviews, *see id.* § 1010.7.2(i); (3) having the investigation conducted by a member of the Police Department, *see id.* §§ 1010.7.1, 1010.10; and (4) having all witness statements recorded, *see id.* § 1010.7.2(h). Supposing that Provo should have followed Policy 1010 and King should have been granted these Policy 1010 protections, we see no material difference they would have made to the outcome of the proceeding. *See Lucas*, 949 P.2d at 755 (affirming a civil service commission's decision because the employee "fail[ed] to establish how [the asserted] procedural errors were harmful" or "how these procedures would have resulted in a different outcome absent such errors").

¶20 During King's interviews with the Director and the Chief, she was aware there was video footage of her making the comment about the flag stands that she claimed not to recall, so whether King was provided an opportunity to view the video

prior to or during her interviews is immaterial.[8] Indeed, at the hearing, King testified after watching the video that she still did not recall making the comment. Thus, King has not shown how she was harmed by not having the video in hand during her interviews with the Director and the Chief.

¶21    Relatedly, King has not pointed us to how she was harmed by not having her counsel present at the pretermination hearing interviews.[9] Instead, King argues generally that she was harmed by not having an attorney present at the interviews "to avoid undue influence, confessions under intimidation or duress, or improper questioning tactics." But again, King offers no concrete examples of these abuses to support her claim. As pointed out above, King's responses to questioning throughout the investigation—whether to the Director, the Chief, or the Commission—remained consistent: she denied the touching incident and stated that she could not recall her statement from the flag incident. Thus, King has not shown "how this procedural infirmity" of not having counsel present during her interviews with the Director and the Chief "could possibly have been harmful." *See Leavitt v. Salt Lake City Corp.*, 2019 UT App 70, ¶ 37, 442 P.3d 1217.

---

8. Provo attempted to provide the video to King's counsel prior to the pretermination meeting with the Chief, both by sending it via email and regular mail.

9. In briefing, King argued that her constitutional due process rights were violated by the lack of counsel at her interviews, but when asked to clarify that claim at oral argument, King's counsel stated that she was not making a constitutional due process argument on this point but rather an argument that Policy 1010 had been violated. Thus, we analyze this issue in the Policy 1010 context only.

¶22 King likewise fails to point to any harm she suffered from having the investigation conducted by the Director instead of the Police Department and from not having the interviews recorded. She makes only broad assertions that the investigation by the Director was "insufficient" and that she was "handicapp[ed]" in preparing her defense for the pretermination hearing. But King does not identify how the result would have been different had the investigation been led by the Police Department. Nor does she identify how recorded interviews would have made any difference, particularly where King received a copy of the investigation report summarizing the interviews prior to the pretermination meeting with the Chief and thus also had it prior to the pretermination hearing. Without identifying "how these procedures would have resulted in a different outcome absent such errors," *see Lucas*, 949 P.2d at 755, King has not carried her burden.

¶23 As a result, even if we assume that it was error to apply Policy 31 instead of Policy 1010, King has failed to show that the "outcome would have been any different" absent the alleged error. *See In re Estate of Valcarce*, 2013 UT App 95, ¶ 37, 301 P.3d 1031. Thus, we will "not disturb the Commission's decision because we are not convinced its support of Provo's use of Policy 31 "exceeds the bounds of reasonableness and rationality." *See Leavitt*, 2019 UT App 70, ¶ 14 (cleaned up). Therefore, we find no abuse of discretion in the Commission's reasonable and rational determination upholding Provo's decision to follow Policy 31.

## II. Substantial Evidence

¶24 Second, King contends that her termination was not supported by substantial evidence. "Although the Commission is not subject to UAPA, it functions similarly to . . . state administrative agencies," so "we adopt and apply the 'substantial evidence' standard applicable to a state administrative agency's findings of fact." *Lucas v. Murray City Civil Service Comm'n*, 949

P.2d 746, 758 (Utah Ct. App. 1997). The question before us, then, "is not whether there are facts in the record that could support a decision more favorable to" King but "whether the Commission's findings, upon which the charges are based, are supported by substantial evidence viewed in light of the whole record before us." *Hollenbach v. Salt Lake City Civil Service Comm'n*, 2015 UT App 116, ¶ 18, 349 P.3d 791 (cleaned up).

¶25 "Substantial evidence is that quantum and quality of relevant evidence that is adequate to convince a reasonable mind to support a conclusion." *Macfarlane v. Career Service Review Office*, 2019 UT App 133, ¶ 33, 450 P.3d 87 (cleaned up). "It is more than a mere scintilla of evidence and something less than the weight of the evidence." *Lucas*, 949 P.2d at 758 (cleaned up). In determining whether the Commission's decision is supported by substantial evidence, "we will consider all the evidence in the record, both favorable and contrary, and determine whether a reasonable mind could reach the same conclusion" as the Commission. *Macfarlane*, 2019 UT App 133, ¶ 33 (cleaned up).

¶26 Here, substantial evidence supports the Commission's findings on both allegations for two reasons. First, there was credible testimony given at the pretermination hearing to support both allegations. As to the flag incident, the Commission heard Officer 1 testify that King said, "What if I hold these like this?" and "Good thing I'm with the SVU guys" as she was holding the flag stands to her chest as if they were breasts. And as to the inappropriate touching incident, the Commission heard testimony from Lydia describing how King grabbed her buttocks in the break room at work and then said, "Sorry, I couldn't help myself" when Lydia turned around. The Commission found Officer 1 and Lydia to be credible but not King, reasoning that King's "failure to recall the [flag] incident when questioned about it" in her interviews "evidenced a lack of forthrightness and candor that could be characterized as being dishonest," especially when King "continued to refuse to acknowledge her lack of

candor even when confronted with video evidence at the [h]earing." We give great deference to those credibility findings as it "is the Commission's role as the ultimate fact-finder to weigh the evidence and make credibility determinations." *Bade-Brown v. Labor Comm'n*, 2016 UT App 65, ¶ 19, 372 P.3d 44. In sum, "we do not review the Commission's findings de novo or reweigh the evidence. Instead, we defer to the Commission's findings on issues of credibility." *Lucas*, 949 P.2d at 758 (cleaned up). Accordingly, we decline to disturb them here.

¶27 Second, there was corroborating evidence on both allegations. Officer 1's testimony about the flag incident was supported by the video evidence. And Lydia's testimony about the inappropriate touching incident was corroborated by her coworkers—who observed Lydia's reaction to the incident and who confirmed that Lydia gave them an account of the incident immediately after it happened—and by Officer 1's testimony that Lydia had disclosed to him and Officer 2 what had happened. In sum, the credible testimony and corroborating video footage and witnesses amount to substantial evidence, or the "quantum and quality of relevant evidence that is adequate to convince a reasonable mind to support a conclusion." *Macfarlane*, 2019 UT App 133, ¶ 33 (cleaned up).

¶28 King also contends the Commission's findings are not supported by substantial evidence because the Weber County Attorney's office dropped its criminal investigation of her. *See supra* note 2. We disagree. Whether a prosecutor had enough evidence to pursue criminal charges against King is beside the point. The "reasonableness and rationality" standard of review is significantly lower than the "beyond a reasonable doubt" standard of proof required for a criminal prosecution. *Compare Ofa v. Department of Human Services*, 2023 UT App 156, ¶ 17, 542 P.3d 511 (stating we "will uphold a reviewing board's affirmance of an agency's decision to terminate unless it exceeds the bounds of reasonableness and rationality" (cleaned up)); *State v. Archuleta*,

2021 UT App 66, ¶ 32, 492 P.3d 801 ("The prosecution's burden of proof in any criminal case . . . is that of beyond a reasonable doubt." (cleaned up)). Furthermore, "as a municipal administrative body, the Commission is not bound by formal rules of evidence and procedure." *Lucas*, 949 P.2d at 755. Thus, the prosecutor's decision of whether to pursue criminal charges and the Commission's decision of whether to affirm Provo's employment decision were necessarily based on different standards of proof. Therefore, the prosecutor's decision regarding whether to pursue charges against King is irrelevant to our analysis.

CONCLUSION

¶29     We decline to grant the relief King seeks because she did not meet her burden of proving that the Commission's alleged error in upholding Provo's use of Policy 31 instead of Policy 1010 in its investigation was harmful. We also conclude that the Commission's findings are supported by substantial evidence. Accordingly, we decline to disturb the Commission's decision upholding the termination of King's employment.

———————